[L.A. No. 29813. In Bank. Apr. 2, 1971.]

MARVIN BRISCOE, Plaintiff and Appellant, v.
READER'S DIGEST ASSOCIATION, INC., Defendant and Respondent.

## COUNSEL

Carl E. Jones for Plaintiff and Appellant.

Ball, Hunt, Hart, Brown & Baerwitz, Joseph A. Ball and Albert H. Ebright for Defendant and Respondent.

## OPINION

**PETERS, J.**—Plaintiff Marvin Brisco filed suit against defendant Reader's Digest Association, alleging that defendant had willfully and maliciously invaded his privacy by publishing an article which disclosed truthful but embarrassing private facts about plaintiff's past life. A demurrer was sustained without leave to amend, and plaintiff has appealed from the ensuing judgment. Thus, we are presented simply with a pleading problem—does the complaint state a cause of action?

The allegations of the complaint may be summarized as follows: On December 15, 1956, plaintiff and another man hijacked a truck in Danville, Kentucky. "[I]mmediately subsequent to said incident, plaintiff abandoned his life of shame and became entirely rehabilitated and has thereafter at all times lived an exemplary, virtuous and honorable life . . . he has assumed a place in respectable society and made many friends who were not aware of the incident in his earlier life."

"The Big Business of Hijacking," published by defendant 11 years after the hijacking incident, commences with a picture whose caption reads, "Today's highwaymen are looting trucks at a rate of more than $100 million a year. But the truckers have now declared all-out war." The article describes various truck thefts and the efforts being made to stop such thefts. Dates ranging from 1965 to the time of publication are mentioned throughout the article, but none of the described thefts is itself dated.

One sentence in the article refers to plaintiff: "Typical of many beginners, Marvin Briscoe and [another man] stole a 'valuable-looking' truck in Danville, Ky., and then fought a gun battle with the local police, only to

learn that they had hijacked four bowling-pin spotters." There is nothing in the article to indicate that the hijacking occurred in 1956.

As the result of defendant's publication,[1] plaintiff's 11-year-old daughter, as well as his friends, for the first time learned of this incident. They thereafter scorned and abandoned him.

Conceding the truth of the facts published in defendant's article, plaintiff claims that the public disclosure of these private facts has humiliated him and exposed him to contempt and ridicule. Conceding that the *subject* of the article may have been "newsworthy," he contends that the use of his *name* was not, and that the defendant has thus invaded his right to privacy.

The concept of a legal right to privacy was first developed by Warren and Brandeis in their landmark law review article, *The Right to Privacy* (1890) 4 Harv.L.Rev. 193. Warren and Brandeis characterized the right to privacy as the individual's "right of determining, ordinarily, to what extent his thoughts, sentiments, and emotions shall be communicated to others." (*Id.,* at p. 198; see also A. Westin, Privacy and Freedom (1967) p. 7; Gross, *The Concept of Privacy* (1967) 42 N.Y.U.L.Rev. 34, 35-36.)[2] Try as they might, Warren and Brandeis had a difficult time tracing a right of privacy to the common law. In many respects a person had less privacy in the small community of the 18th century than he did in the urbanizing late 19th century or he does today in the modern metropolis. Extended family networks, primary group relationships, and rigid communal mores served to expose an individual's every deviation from the norm and to straitjacket him in a vise of backyard gossip. Yet Warren and Brandeis perceived that it was mass exposure to public gaze, as opposed to backyard gossip, which threatened to deprive men of the right of "scratching wherever one itches." (Westin, *Science, Privacy, and Freedom: Issues and Proposals for the 1970's* (1966) 66 Colum.L.Rev. 1003, 1025.)

Acceptance of the right to privacy has grown with the increasing capability of the mass media and electronic devices with their capacity to destroy an individual's anonymity, intrude upon his most intimate activities, and expose his most personal characteristics to public gaze.

---

[1] The article was a condensed version of an article which originally appeared in the December 10, 1967, issue of Chicago's American Magazine, published by the Chicago American Publishing Company. It is not alleged that this first publication injured plaintiff. Defendant concedes that this first publication does not absolve it from responsibility.

[2] Although other ways in which the word "privacy" is used—to indicate an interest in mental repose, physical solitude, or autonomy—are weaker senses of the word (Gross, *supra,* at pp. 36-39), the "right of privacy" has also served as a general rallying point for those concerned about "deep intrusions on human dignity by those in possession of economic or governmental power." (Havighurst, *Foreward* (1966) 31 Law & Contemp. Prob. 251, 252.)

In a society in which multiple, often conflicting role performances are demanded of each individual, the original etymological meaning of the word "person"—mask—[3] has taken on new meaning. Men fear exposure not only to those closest to them; much of the outrage underlying the asserted right to privacy is a reaction to exposure to persons known only through business or other secondary relationships. The claim is not so much one of total secrecy as it is of the right to *define* one's circle of intimacy—to choose who shall see beneath the quotidian mask. Loss of control over which "face" one puts on may result in literal loss of self-identity (Westin, *supra*, at p. 1023; cf. Fried, *Privacy* (1968) 77 Yale L.J. 475), and is humiliating beneath the gaze of those whose curiosity treats a human being as an object.

A common law right to privacy, based on Warren and Brandeis' article, is now recognized in at least 36 states. (Prosser, Law of Torts (3d ed. 1964) at pp. 831-832; *Commonwealth* v. *Wiseman* (1969) 356 Mass. 251 [249 N.E.2d 610], cert. den. (1970) 398 U.S. 960 [26 L.Ed.2d 546, 90 S.Ct. 2165]; *Hamberger* v. *Eastman* (1964) 106 N.H. 107 [206 A.2d 239, 11 A.L.R.3d 1288]; *Rugg* v. *McCarty* (Colo. 1970) 476 P.2d 753; *Fergerstrom* v. *Hawaiian Ocean View Estates* (1968) 50 Hawaii 374 [441 P.2d 141]; *Apodaca* v. *Miller* (1968) 79 N.M. 160 [441 P.2d 200].) California has recognized the right to privacy for 40 years. (*Melvin* v. *Reid* (1931) 112 Cal.App. 285 [297 P. 91].)

The right to keep information private was bound to clash with the right to disseminate information to the public. We early noted the potential conflict between freedom of the press and the right of privacy (*Gill* v. *Curtis Publishing Co.*, 38 Cal.2d 273, 277-278 [239 P.2d 630]; *Gill* v. *Hearst Publishing Co.*, 40 Cal.2d 224, 228 [253 P.2d 441]), as did Warren and Brandeis themselves, who suggested that the right should not apply to matters of "public or general interest." (Warren and Brandeis, *supra*, 4 Harv.L.Rev. 193, 214.)[4] The instant case, pitting a rehabilitated felon's right to anonymity against a magazine's right to identify him, compels us to consider the character of these competing interests.

■ The central purpose of the First Amendment "is to give to every voting member of the body politic the fullest possible participation in the

[3]Webster's New International Dictionary (2d ed. 1958) at p. 1827.

[4]One writer suggests that the First Amendment's scope is so great as to "swallow the tort." (See Kalven, *Privacy in Tort Law—Were Warren and Brandeis Wrong?* (1966) 31 Law & Contemp. Prob. 326.) Most commentators place greater emphasis on the right to privacy. (See Bloustein, *Privacy, Tort Law, and the Constitution: Is Warren and Brandeis' Tort Petty and Unconstitutional as Well?* (1968) 46 Tex.L.Rev. 611; see also Nimmer, *The Right to Speak from TIMES to TIME: First Amendment Theory Applied to Libel and Misapplied to Privacy* (1968) 56 Cal.L.Rev. 935.)

understanding of those problems with which the citizens of a self-governing society must deal. . . ."[5] (A. Meiklejohn, Political Freedom: The Constitutional Powers of the People (1960) p. 75.) ■ Nor is freedom of the press confined to comment upon public affairs and those persons who have voluntarily sought the public spotlight. "Freedom of discussion . . . must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period. . . ." (*Thornhill* v. *Alabama* (1940) 310 U.S. 88, 102 [84 L.Ed. 1093, 1102, 60 S.Ct. 736]; see *Time, Inc.* v. *Hill* (1967) 385 U.S. 374, 388 [17 L.Ed.2d 456, 467, 87 S.Ct. 534].) ■ The scope of the privilege thus extends to almost all reporting of recent events, even though it involves the publication of a purely private individual's name or likeness. (See, e.g., *Metter* v. *Los Angeles Examiner,* 35 Cal.App.2d 304 [95 P.2d 491]; *Coverstone* v. *Davies,* 38 Cal.2d 315 [239 P.2d 876].)[6]

■ Particularly deserving of First Amendment protection are reports of "hot news," items of possible immediate public concern or interest. The need for constitutional protection is much greater under these circumstances, where deadlines must be met and quick decisions made, than in cases where more considered editorial judgments are possible. (*Rosenbloom* v. *Metromedia, Inc.* (3d Cir. 1969) 415 F.2d 892, 895-896.)[7] Most

---

[5]Almost any truthful commentary on public officials or public affairs, no matter how serious the invasion of privacy, will be privileged. By volunteering his services for public office the official (as opposed to the ordinary employee) waives much of his right to privacy.

Other individuals who voluntarily seek the public eye are also subject to fair comment and criticism. (Prosser, Law of Torts, *supra,* at p. 844.) Because discussion of such figures is not so vital to the maintenance of our self-governing democracy as is discussion of public officials and public affairs, such figures may have greater protection from media exposure or untruths. (See *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130, 155 [18 L.Ed.2d 1094, 1111, 87 S.Ct. 1975].)

[6]The publisher need not intend to educate the public. "The line between . . . informing and . . . entertaining is too elusive. . . . Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine. . . ." (*Winters* v. *New York* (1948) 333 U.S. 507, 510 [92 L.Ed. 840, 847, 68 S.Ct. 665].)

[7]This is not to say, however, that *all* factual reports of current events have been held absolutely privileged. (See, e.g., *Commonwealth* v. *Wiseman, supra,* 249 N.E.2d 610 [film showing conditions in mental hospital, including naked inmates, forced feedings, masturbation, sadism; individuals identifiable]; *Lambert* v. *Dow Chemical Company* (La.App. 1968) 215 So.2d 673 [identified picture of plaintiff's unsightly wounds]; *Daily Times Democrat* v. *Graham* (1964) 276 Ala. 380 [162 So.2d 474] [identifiable picture of plaintiff with dress blown above her waist]; *Harms* v. *Miami Daily News, Inc.* (Fla.App. 1961) 127 So.2d 715 [phone number of woman identified as having sexy voice]; *Tribune Review Publishing Company* v. *Thomas* (3d Cir. 1958) 254 F.2d 883 [picture of criminal defendant in courthouse]; *In re Mack* (1956) 386 Pa. 251 [126 A.2d 679], cert. den. 352 U.S. 1002 [1 L.Ed.2d 547, 77 S.Ct. 559] [picture of convicted murderer in courthouse just prior to sentencing]; *Barber* v. *Time, Inc.* (1942) 348 Mo. 1199 [159 S.W.2d 291] [name and picture of woman with

factual reporting concerns current events. For example, in *Time, Inc.* v. *Hill, supra,* 385 U.S. 374, 383-384, fn. 7 [17 L.Ed.2d 456, 464-465], the court cited 22 cases in which the right of privacy gave way to the right of the press to publish matters of public interest. Seventeen of these 22 cases (77.3 percent) involved events which had occurred quite recently.[8]

There can be no doubt that reports of current criminal activities are the legitimate province of a free press. The circumstances under which crimes occur, the techniques used by those outside the law, the tragedy that may befall the victims—these are vital bits of information for people coping with the exigencies of modern life. Reports of these events may also promote the values served by the constitutional guarantee of a public trial. Although a case is not to be "tried in the papers," reports regarding a crime or criminal proceedings may encourage unknown witnesses to come forward with useful testimony and friends or relatives to come to the aid of the victim.[9]

It is also generally in the social interest to identify adults currently charged with the commission of a crime. While such an identification may not presume guilt, it may legitimately put others on notice that the named individual is suspected of having committed a crime. Naming the suspect may also persuade eyewitnesses and character witnesses to testify. For these reasons, while the suspect or offender obviously does not consent to public exposure, his right to privacy must give way to the overriding social interest.

---

humiliating diseases]; cf. *Tollefson* v. *Price* (1967) 247 Ore. 398 [430 P.2d 990] [advertising that plaintiff owed business debts]; *Trammell* v. *Citizens News Co.* (1941) 285 Ky. 529 [148 S.W.2d 708] [advertising that plaintiff owed business debts]; *York* v. *Story* (9th Cir. 1963) 324 F.2d 450, cert. den. 376 U.S. 939 [11 L.Ed.2d 659, 84 S.Ct. 794] [indecent photos of plaintiff in poses induced by police officer].)

[8]Another of these cases (*Thompson* v. *Curtis Publishing Co.* (3d Cir. 1952) 193 F.2d 953) clearly involved voluntary waiver. In *Samuel* v. *Curtis Pub. Co.* (N.D.Cal. 1954) 122 F.Supp. 327, a photograph of plaintiff restraining a would-be suicide was republished two years after the event. The court found that there was nothing offensive or discreditable to a reasonable man in the photograph. In *Miller* v. *National Broadcasting Company* (D.Del. 1957) 157 F.Supp. 240, plaintiff was presently incarcerated, and would not be heard to complain of a dramatic reenactment of his crime four years later. Of the 22 cases cited, only in *Barbieri* v. *News-Journal Company* (Del. 1963) 189 A.2d 773, which explicitly rejects our landmark decision of *Melvin* v. *Reid, supra,* 112 Cal.App. 285, and in *Smith* v. *Doss* (1948) 251 Ala. 250 [37 So.2d 118], is the recall of past events involving nonpublic figures at issue. In the latter case the spectacular disappearance of plaintiff's father, who was thought murdered, the accusation of an innocent man, and the discovery 25 years later of the facts (the father had deserted his family) was said to be so imprinted on the community's collective history that publication was privileged.

[9]We express no opinion, however, regarding the propriety of pretrial court orders, designed to ensure a fair trial, to the effect that parties and their counsel may not comment on a case to the news media.

█ In general, therefore, truthful reports of *recent* crimes and the names of suspects or offenders will be deemed protected by the First Amendment.[10]

The instant case, however, compels us to consider whether reports of the facts of *past* crimes and the identification of *past* offenders serve these same public-interest functions.

We have no doubt that reports of the facts of past crimes are newsworthy. Media publication of the circumstances under which crimes were committed in the past may prove educational in the same way that reports of current crimes do. The public has a strong interest in enforcing the law, and this interest is served by accumulating and disseminating data cataloguing the reasons men commit crimes, the methods they use, and the ways in which they are apprehended. Thus in an article on truck hijackings, Reader's Digest certainly had the right to report the *facts* of plaintiff's criminal act.

However, identification of the *actor* in reports of long past crimes usually serves little independent public purpose. Once legal proceedings have terminated, and a suspect or offender has been released, identification of the individual will not usually aid the administration of justice. Identification will no longer serve to bring forth witnesses or obtain succor for victims. Unless the individual has reattracted the public eye to himself in some independent fashion, the only public "interest" that would usually be served is that of curiosity.

---

[10]We do not mean to imply that the First Amendment gives the media the unmitigated right to publish the identity of suspected offenders or victims. In some jurisdictions, for example, the Legislature has decided that the rehabilitative goals of the juvenile law are so important as to override the right of the press to identify juvenile defendants. (See, e.g., Virgin Islands Code, title 5, § 2511; Fla.Stat. § 801.14 (sex offenses only).) In many other states the rights of the press to report juvenile proceedings are limited. In *In re Gault* (1967) 387 U.S. 1, 25 [18 L.Ed.2d 527, 544, 87 S.Ct. 1428], the United States Supreme Court gave implicit approval to such restrictions on First Amendment rights. (See also *Government of Virgin Islands* v. *Brodhurst* (D.Virgin Islands 1968) 285 F.Supp. 831, holding the Virgin Islands statute prohibiting the naming of juvenile defendants constitutional as against a First Amendment challenge; Geis, *Publication of the Names of Juvenile Felons* (1962) 23 Mont. L.Rev. 141.)

Similarly, some states have prohibited the naming of rape victims in news reports. (Fla.Stat. § 794.03; Ga. Code Ann. § 26-2105; S.C. Code Ann. § 16-81; Wis.Stats.Ann. § 942.02.) The Wisconsin statute has been held constitutional. (*State* v. *Evjue* (1948) 253 Wis. 146 [33 N.W.2d 305] (holding that the minimum social value of publication is outweighed by the encouragement given to victims to complain to the police once their privacy is guaranteed).) In *Nappier* v. *Jefferson Standard Life Insurance Company* (4th Cir. 1963) 322 F.2d 502, the South Carolina statute was not only upheld, following the reasoning of *Evjue*, but also was extended to apply to *any* identification of the victims (in this case televising a picture of their well-known business truck with a report that it belonged to the victims). We of course express no opinion on these matters.

There may be times, of course, when an event involving private citizens may be so unique as to capture the imagination of all. In such cases—e.g., the behavior of the passengers on the sinking *Titanic,* the heroism of Nathan Hale, the horror of the Saint Valentine's Day Massacre—purely private individuals may by an accident of history lose their privacy regarding that incident for all time. There need be no "reattraction" of the public eye because the public interest never wavered. ■ An individual whose name is fixed in the public's memory, such as that of the political assassin, never becomes an anonymous member of the community again. But in each case it is for the trier of fact to determine whether the individual's infamy is such that he has never left the public arena; we cannot do so as a matter of law.

The Restatement of Torts some time ago balanced the considerations relevant here, concluding that criminals "are the objects of legitimate public interest during a period of time after their conduct . . . has brought them to the public attention; until they have reverted to the lawful and unexciting life led by the great bulk of the community, they are subject to the privileges which publishers have to satisfy the curiosity of the public as to their leaders, heroes, villains and victims." (§ 867, com. c.) Where a man has reverted to that "lawful and unexciting life" led by others, the Restatement implies that he no longer need "satisfy the curiosity of the public."

Another factor militating in favor of protecting the individual's privacy here is the state's interest in the integrity of the rehabilitative process. Our courts recognized this issue four decades ago in *Melvin* v. *Reid, supra,* 112 Cal.App. 285. There, plaintiff had been a prostitute. She was charged with murder and acquitted after a long and very public trial. She thereafter abandoned her life of shame, married, and assumed a place in respectable society, making many friends who were not aware of the incidents of her earlier life.

Seven years after the trial defendants made a movie based entirely on Mrs. Melvin's early life. They used only facts found in the public record, and did not falsify or create false innuendoes regarding that period of her life. Defendants used Mrs. Melvin's true maiden name in the film.

The Court of Appeal, in a decision cited ceaselessly since, held that the *subject* of the film was protected. No cause of action accrues from the use of "incidents of a life . . . so public as to be spread upon a public record," the court reasoned, since these matters "cease to be private." (112 Cal.App. at pp. 290-291.) The court took a different view of defendants' use of Mrs. Melvin's *name.* Although that, too, had been spread upon a public record, the court held that defendants' use of plaintiff's name was improper.

The lapse of time between the incidents in issue and the making of the film was a relevant, but not conclusive, factor to the court.[11] Rather, the Court of Appeal emphasized that "[o]ne of the major objectives of society . . . and of the administration of our penal system, is the rehabilitation of the fallen and the reformation of the criminal. . . . Where a person has . . . rehabilitated himself, we, as right-thinking members of society, should permit him to continue in the path of rectitude rather than throw him back into a life of shame or crime. Even the thief on the cross was permitted to repent during the hours of his final agony." (112 Cal.App. at p. 292.) The plaintiff was held to have stated a cause of action for invasion of privacy.

One of the premises of the rehabilitative process is that the rehabilitated offender can rejoin that great bulk of the community from which he has been ostracized for his anti-social acts. In return for becoming a "new man," he is allowed to melt into the shadows of obscurity.[12]

We are realistic enough to recognize that men are curious about the inner sanctums of their neighbors—that the public will create its heroes and villains. We must also be realistic enough to realize that full disclosure of one's inner thoughts, intimate personal characteristics, and past life is neither the rule nor the norm in these United States. We have developed a variegated panoply of professional listeners to whom we confidentially "reveal all"; otherwise we keep our own counsel. The masks we wear may be stripped away upon the occurrence of some event of public interest. But just as the risk of exposure is a concomitant of urban life, so too is the expectation of anonymity regained. It would be a crass legal fiction to assert that a matter once public never becomes private again.[13] Human

---

[11]See Note, *The Right of Privacy: Normative-Descriptive Confusion in the Defense of Newsworthiness* (1963) 30 U.Chi.L.Rev. 722, 733-734.

[12]The purpose of the indeterminate sentence law in California (Pen. Code, § 1168), for example, is "to put before the prisoner great incentive to well-doing. . . ." (*In re Lee*, 177 Cal. 690, 692 [171 P. 958]; *Grasso* v. *McDonough Power Equipment, Inc.*, 264 Cal.App.2d 597, 600 [70 Cal.Rptr. 458].) The indeterminate sentence law in theory "affords a person convicted of crime the opportunity to *minimize* the term of imprisonment by rehabilitating himself in such manner that he may again become a useful member of society, . . ." (*People* v. *Wade*, 266 Cal.App.2d 918, 928 [72 Cal.Rptr. 538]; italics added.)

[13]"A public figure . . . can be so far removed from his former position in the public eye, that the publisher will no longer enjoy the prophylactic treatment accorded him when he deals with those persons who truly are public officials or public figures. . . ." (*Johnston* v. *Time, Inc.* (M.D. N.C. 1970) 321 F.Supp. 837 [former professional basketball player no longer a public figure, had regained right to privacy].) "[I]t is erroneous . . . to assume that privacy, though lost for a certain time or in a certain context, goes forever unprotected. . . ." (*Spahn* v. *Julian Messner, Inc.* (1966) 18 N.Y.2d 324, 328 [274 N.Y.S.2d 877, 221

forgetfulness over time puts today's "hot" news in tomorrow's dusty archives. In a nation of 200 million people there is ample opportunity for all but the most infamous to begin a new life.

Plaintiff is a man whose last offense took place 11 years before, who has paid his debt to society, who has friends and an 11-year-old daughter who were unaware of his early life—a man who has assumed a position in "respectable" society. Ideally, his neighbors should recognize his present worth and forget his past life of shame. But men are not so divine as to forgive the past trespasses of others, and plaintiff therefore endeavored to reveal, as little as possible of his past life. Yet, as if in some bizarre canyon of echoes, petitioner's past life pursues him through the pages of Reader's Digest, now published in 13 languages and distributed in 100 nations, with a circulation in California alone of almost 2,000,000 copies.

In a nation built upon the free dissemination of ideas, it is always difficult to declare that something may not be published.[14] ▉ But the great general interest in an unfettered press may at times be outweighed by other great societal interests.[15] As a people we have come to recognize that one

---

N.E.2d 543]; accord, *Leverton* v. *Curtis Pub. Co.* (3d Cir. 1951) 192 F.2d 974; *Mau* v. *Rio Grande Oil, Inc.* (N.D.Cal. 1939) 28 F.Supp. 845; see Note, *supra,* 30 U.Chi.L.Rev. 722, 726-727.)

In *Time, Inc.* v. *Hill, supra,* 385 U.S. 374, plaintiffs had been held hostage in their own home by escaped criminals three years prior to publication of the article in Life magazine. Their plight had been fully reported at the time. The court did not even question whether that previously publicly reported event remained public; the Hills were assumed to have a right to privacy concerning the event.

[14]Judicial attempts at defining what constitutes "news" are fraught with oversimplification. Thus news has been defined as the "report of recent occurrences" (*Jenkins* v. *News Syndicate Co., Inc.* (1926) 128 Misc. 284, 285 [219 N.Y.S. 196]) or as all factual reports with "that indefinable quality of interest, which attracts public attention." (*Associated Press* v. *International News Service* (2d Cir. 1917) 245 F. 244, 248 [157 C.C.A. 436, 2 A.L.R. 317] affd. 248 U.S. 215 [63 L.Ed. 211, 39 S.Ct. 68].)

[15]The notion of balancing competing interests is not foreign to First Amendment controversies. The extent to which government may proscribe advocacy of the use of force or violation of law has long occupied the attention of the judiciary. (See, e.g., *Schenck* v. *United States* (1919) 249 U.S. 47, 52 [63 L.Ed. 470, 473, 39 S.Ct. 247] [Holmes' adumbration of the "clear and present danger" test]; *Whitney* v. *California* (1927) 274 U.S. 357 [71 L.Ed. 1095, 47 S.Ct. 641]; *Dennis* v. *United States* (1951) 341 U.S. 494, 507 [95 L.Ed. 1137, 1151, 71 S.Ct. 857].) In *Brandenburg* v. *Ohio* (1969) 395 U.S. 444, 447 [23 L.Ed.2d 430, 434, 89 S.Ct. 1827], the United States Supreme Court held that such proscription would be allowed only where "such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."

In *Roth* v. *United States* (1957) 354 U.S. 476, 485 [1 L.Ed.2d 1498, 1507, 77 S.Ct. 1304], the court held that obscene utterances " '*are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.*' " (See also cases cited *supra,* fns. 7 and 10; Wright, *Defamation, Privacy, and the Public's Right to Know: A National Problem and a New Approach* (1968) 46 Tex.L.Rev. 630, 633.)

of these societal interests is that of protecting an individual's right to privacy. The right to know and the right to have others *not* know are, simplistically considered, irreconcilable. ■ But the rights guaranteed by the First Amendment do not require total abrogation of the right to privacy. The goals sought by each may be achieved with a minimum of intrusion upon the other.

In *Time, Inc.* v. *Hill, supra,* 385 U.S. 374, 383 [17 L.Ed.2d 456, 464], the United States Supreme Court considered some of these same balancing problems with regard to a different form of invasion of privacy, that of placing the individual in a false light in the public eye. The New York statute construed in *Time* did not create a right of action for the truthful report of newsworthy people or events.[16] The Supreme Court stated, however, that "[t]his limitation to newsworthy persons and events does not of course foreclose an interpretation . . . to allow damages where 'Revelations may be so intimate and so unwarranted in view of the victim's position as to outrage the community's notions of decency.' . . ." (385 U.S. at p. 383, fn. 7 [17 L.Ed.2d at p. 464].) ■ Thus a truthful publication is constitutionally protected if (1) it is newsworthy and (2) it does not reveal facts so offensive as to shock the community's notions of decency.

■ We have previously set forth criteria for determining whether an incident is newsworthy. We consider "[1] the social value of the facts published, [2] the depth of the article's intrusion into ostensibly private affairs, and [3] the extent to which the party voluntarily acceded to a position of public notoriety. [Citations.]" (*Kapellas* v. *Kofman,* 1 Cal.3d 20, 36 [81 Cal.Rptr. 360, 459 P.2d 912].)

■ On the assumed set of facts before us we are convinced that a jury could reasonably find that plaintiff's identity as a former hijacker was not newsworthy. First, as discussed above, a jury could find that publication of plaintiff's identity in connection with incidents of his past life was in this case of minimal social value. There was no independent reason whatsoever for focusing public attention on Mr. Briscoe as an individual at this time. A jury could certainly find that Mr. Briscoe had once again become an anonymous member of the community. Once legal proceedings have concluded, and particularly once the individual has reverted to the

---

[16]New York does not recognize a common law right to privacy. Its statutory right to privacy provides no relief for the publication of truthful but embarrassing private facts so long as the reports concern newsworthy persons or events. (*Spahn* v. *Julian Messner, Inc., supra,* 18 N.Y.2d 324, 328, vacated on other grounds 387 U.S. 239 [18 L.Ed.2d 744, 87 S.Ct. 1706], affd. 21 N.Y.2d 124 [286 N.Y.S. 832, 233 N.E.2d 84], app. dism. (1969) 393 U.S. 1046 [21 L.Ed.2d 600, 89 S.Ct. 676].)

lawful and unexciting life led by the rest of the community, the public's interest in knowing is less compelling.

Second, a jury might find that revealing one's criminal past for all to see is grossly offensive to most people in America. Certainly a criminal background is kept even more hidden from others than a humiliating disease (*Barber* v. *Time, Inc., supra,* 348 Mo. 1199 [159 S.W.2d 291]) or the existence of business debts (*Trammell* v. *Citizens News Co., Inc., supra,* 285 Ky. 529 [148 S.W.2d 708]; *Tollefson* v. *Price, supra,* 247 Ore. 398 [430 P.2d 990, 33 A.L.R.3d 149]).[17] The consequences of revelation in this case—ostracism, isolation, and the alienation of one's family—make all too clear just how deeply offensive to most persons a prior crime is and thus how hidden the former offender must keep the knowledge of his prior indiscretion.

Third, in no way can plaintiff be said to have voluntarily consented to the publicity accorded him here. He committed a crime. He was punished. He was rehabilitated. And he became, for 11 years, an obscure and law-abiding citizen. His every effort was to forget and have others forget that he had once hijacked a truck.

Finally, the interests at stake here are not merely those of publication and privacy alone, for the state has a compelling interest in the efficacy of penal systems in rehabilitating criminals and returning them as productive and law-abiding citizens to the society whence they came. A jury might well find that a continuing threat that the rehabilitated offender's old identity will be resurrected by the media is counter-productive to the goals of this correctional process.

Mindful that "the balance is always weighted in favor of free expression" (*Liberty Lobby, Inc.* v. *Pearson* (1968) 390 F.2d 489, 491 [129 App. D.C. 74]), and that we must not chill First Amendment freedoms through uncertainty,[18] we find it reasonable to require a plaintiff to prove, in each

---

[17]The instant case must be contrasted with the situation in *Time, Inc.* v. *Hill, supra,* 385 U.S. 374; most people would not consider their former momentary status as a hostage of escaped criminals to be so offensive or discreditable as to render the disclosure of this fact outrageous. (Cf. *Melvin* v. *Reid, supra,* 112 Cal.App. 285; *Mau* v. *Rio Grande Oil, Inc., supra,* 28 F.Supp. 845, 846; *Binns* v. *Vitagraph Co.* (1913) 210 N.Y. 51 [103 N.E. 1108].) Compare *Commonwealth* v. *Wiseman, supra,* 249 N.E.2d 610, limiting public access to defendant's film on Bridgewater Hospital (Titicut Follies) because the film invaded the inmates' right to privacy by showing scenes of forced feeding, masturbation, etc.

[18]Because the categories with which we deal—private and public, newsworthy and nonnewsworthy—have no clear profile, there is a temptation to balance interests in ad hoc fashion in each case. Yet history teaches us that such a process leads too often to discounting society's stake in First Amendment rights. (See Nimmer, *supra,* 56 Cal.L.Rev. 935, 939-941.) We therefore strive for as much predictability as possible within our system of case-by-case adjudication, lest we unwittingly chill First Amend-

case, that the publisher invaded his privacy with reckless disregard for the fact that reasonable men would find the invasion highly offensive.[19]

We do not hold today that plaintiff must prevail in his action. ██ It is for the trier of fact to determine (1) whether plaintiff had become a rehabilitated member of society, (2) whether identifying him as a former criminal would be highly offensive and injurious to the reasonable man, (3) whether defendant published this information with a reckless disregard for its offensiveness, and (4) whether any independent justification for printing plaintiff's identity existed. ██ We hold today only that, as pleaded, plaintiff has stated a valid cause of action, sustaining the demurrer to plaintiff's complaint was improper, and that the ensuing judgment must therefore be reversed.

Plaintiff also claims that defendant's article placed him in a false light in the public eye by implying that his criminal activity was of recent vintage. He refers to the words "today" and "now" in the opening caption to the article, and the numerous recent dates mentioned, and contends that these imply to the reasonable man that the incident described took place recently.

We have previously stated that a "false light" cause of action "is in substance equivalent to . . . [a] libel claim, and should meet the same requirements of the libel claim . . . including proof of malice (cf. *Time, Inc.* v. *Hill* (1967) 385 U.S. 374 [17 L.Ed.2d 456, 87 S.Ct. 534]) and fulfillment of the requirements of section 48a [of the Civil Code] (See *Werner* v. *Times-Mirror Co.,* 193 Cal.App.2d 111, 122-123 [14 Cal.Rptr. 208].)" (*Kapellas* v. *Kofman, supra,* 1 Cal.3d 20, 35, fn. 16.)[20]

Plaintiff here alleged malice, but at no time complied with the requirements of section 48a. It would therefore be possible for him to amend his complaint to state a cause of action based on a "false light" theory only if he alleged special damages.

---

ment freedoms. "One steers clear of a barbed wire fence . . . he stays even farther away if he is not sure exactly where the fence is. . . ." (Wright, *supra,* 46 Tex.L.Rev. 630, 634.)

However, there is little uncertainty here. A publisher does have every reason to know, *before* publication, that identification of a man as a former criminal will be highly offensive to the individual involved. It does not require close reading of "Les Miserables" or "The Scarlet Letter" to know that men are haunted by the fear of disclosure of their past and destroyed by the exposure itself.

[19]In alleging malice and willfulness in his complaint, plaintiff has complied with this initial requirement.

[20]Section 48a requires a libelled individual, within 20 days of learning of the publication, to advise the publisher specifically what statements he claims to be libelous and to request that the statements be corrected. Recovery of general damages is possible only if the section is complied with and if the publisher fails to correct the libelous statement.

 Defendant demurred specially as well as generally to plaintiff's complaint. The trial court sustained defendant's demurrer without leave to amend in general terms, contrary to Code of Civil Procedure section 472d. Under such circumstances we must assume that the court ruled only on the general demurrer and not on the special demurrer. (*Weinstock* v. *Eissler*, 224 Cal.App.2d 212, 237 [36 Cal.Rptr. 537]; *Stowe* v. *Fritzie Hotels, Inc.*, 44 Cal.2d 416, 425 [282 P.2d 890].)

The judgment is reversed and the cause is remanded to the trial court with directions to overrule the general demurrer and to rule upon the points presented by the special demurrer. Appellant shall recover costs on appeal.

Wright, C. J., McComb, J., Tobriner, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

Respondent's petition for a rehearing was denied April 29, 1971.