131 Cal.Rptr.2d 534 (2003)
106 Cal.App.4th 677
Steve GATES, Plaintiff and Respondent,
v.
DISCOVERY COMMUNICATIONS, INC. et al. Defendants and Appellants.
No. D039399.
Court of Appeal, Fourth District, Division One.
February 27, 2003.
Review Granted June 18, 2003.
*535 Leopold, Petrich & Smith, Louis P. Petrich and Robert S. Gutierrez, Los Angeles, for Defendants and Appellants.
*536 Niles R. Sharif, San Diego, for Plaintiff and Respondent.
BENKE, J.
Steve Gates sued Discovery Communications, Inc., and New Dominion Pictures, Inc. (Discovery), for defamation and invasion of privacy. Discovery's demurrer to the defamation cause of action was sustained without leave to amend. Its motion to strike the privacy action under California's Anti-SLAPP[1] statute (Code Civ. Proc.,[2] § 425.16) was denied. Discovery appeals, arguing the trial court erred in denying the motion.

BACKGROUND AND PROCEDURE
Gates filed a complaint asserting causes of action for defamation and invasion of privacy. The complaint alleged that in 1988 Will Nix and others conspired to and succeeded in murdering Salvatore Ruscitti. Gates was an employee of Nix. While initially charged as a co-conspirator, Gates eventually pleaded guilty to being an accessory after the fact and was sentenced to three years in prison.
Discovery was the producer of a television series, The Prosecutors. The program re-enacted notorious crimes, identified the perpetrators and victims and included interviews with investigators and prosecutors. In 2001 the series aired an episode entitled "Deadly Commission" dealing with the Ruscitti murder. The program purported to portray Gates's involvement in the crime.
In his cause of action for defamation Gates alleged that after his release from prison he led a lawful, productive life and was a respected member of the community. He asserted Discovery's program falsely portrayed him as a member of the conspiracy to murder Ruscitti, falsely depicted him as participating in a telephone tap to develop evidence against Nix and falsely indicated that Gates was a self-confessed murderer.
Gates stated his invasion of privacy action was based on Discovery's "revelation that [he] pleaded guilty to being an accessory after the fact to a murder for hire and the airing by Defendants of [his] photograph." Gates stated these were private facts he wished to keep private.
Discovery filed a demurrer to each cause of action and a special motion to strike pursuant to section 425.16. Discovery argued Gates was a limited purpose public figure who could not demonstrate that the allegedly defamatory statements were made with actual malice, Discovery published constitutionally privileged, truthful and newsworthy information taken from a public record and, finally, the information was privileged under Civil Code section 47, subdivision (d), because it was a true report in a public journal of a judicial proceeding.
Gates opposed the motion to strike, arguing that section 425.16 did not apply since his complaint was not filed to chill Discovery's free speech rights.
The trial court granted Discovery's demurrer as to the defamation cause of action, finding that the gist of Discovery's report concerning Gates was accurate. The court denied the demurrer as to the invasion of privacy cause of action. The trial court denied Discovery's section 425.16 motion as to the invasion of privacy cause of action, finding that Discovery had failed to demonstrate that its account of *537 Gates's involvement in the crime, while true, was newsworthy.

DISCUSSION
Discovery argues the trial court erred in denying its special motion to strike. Discovery contends the Anti-SLAPP statute applies to its program concerning the Ruscitti murder and Gates's participation in the crime. Discovery notes as such the trial court was required to strike Gates's privacy action unless Gates established there was a probability he would prevail on the claim at trial. Discovery argues that as a matter of California privacy law, Gates could not do so because the facts disclosed in its program were public and because they were matters of legitimate public concern. It argues Gates could not prevail on his claim since liability cannot arise from the publication of truthful, newsworthy information contained in public records nor from the publication of truthful information, lawfully obtained about a matter of public significance. Discovery finally argues its broadcast was privileged since it was a fair and true report in a public journal of a judicial proceeding. (Civ.Code, § 47, subd. (d).)
Ultimately, all of these claims turn on the continuing viability of Briscoe v. Reader's Digest Association, Inc. (1971) 4 Cal.3d 529, 93 Cal.Rptr. 866, 483 P.2d 34 (Briscoe). Briscoe, which involved facts very similar to those in the present case, dealt with the inherent tension between the right of privacy and the rights of freedom of the press and speech. It resolved that tension in a way that makes it probable Gates would prevail on his privacy cause of action here. However, in light of later United States Supreme Court authority addressing the same constitutional tension, we conclude Briscoe is no longer the law. The subsequent authority supports Discovery's position that its report was protected by the First Amendment. We conclude those cases would make it impossible for Gates to prevail on his privacy action. The trial court, therefore, erred in failing to strike the action pursuant to section 425.16.

A. Law

1. Section 425.16
In 1992 the Legislature enacted section 425.16 in response to the perception that there had been an increase in lawsuits designed to chill the exercise of the rights or freedom of speech and to petition for a redress of grievances. (§ 425.16, subd. (a); Mattel, Inc. v. Luce, Forward, Hamilton & Scripps (2002) 99 Cal.App.4th 1179, 1187-1188, 121 Cal.Rptr.2d 794; Wilcox v. Superior Court (1994) 27 Cal.App.4th 809, 817, 33 Cal.Rptr.2d 446.)
Section 425.16, subdivision (b)(1), provides: "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States or California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."
The defendant must establish that the challenged action qualifies for treatment under the section. Acts in furtherance of a person's right to free speech that qualify for treatment are listed in section 425.16, subdivision (e). The ones arguably relevant to this case are section 425.16, subdivision (e), subparagraphs (2) "any written or oral statement or writing made in connection with an issue under consideration or review by a . . . judicial body," (3) "any written or oral statement or writing made in a place open to the public or a public forum in connection with an issue of public *538 interest" and (4) "any other conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (See Mattel, Inc. v. Luce, Forward, Hamilton & Scripps, supra, 99 Cal.App.4th at p. 1188, 121 Cal.Rptr.2d 794.)
If the defendant establishes that the action qualifies for treatment under the section, the plaintiff must demonstrate the "probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1).) Evidence on the issue must be admissible. The court does not weigh the evidence. It determines instead whether the plaintiff has established a prima facie case that if believed by the trier of fact would result in a judgment for the plaintiff. (Mattel, Inc. v. Luce, Forward, Hamilton & Scripps, supra, 99 Cal.App.4th at p. 1188, 121 Cal. Rptr.2d 794.)
"Whether section 425.16 applies and whether the plaintiff has shown a probability of prevailing are legal questions which we review independently on appeal. [Citations.]" (Seelig v. Infinity Broadcasting Corp. (2002) 97 Cal.App.4th 798, 807, 119 Cal.Rptr.2d 108.) The section requires we construe it broadly to protect the rights of petition and free speech. (§ 425.16, subd. (a).)

2. Invasion of Privacy
Gates's invasion of privacy cause of action was based on a claimed disclosure of private facts, i.e., that he pleaded guilty to being an accessory after the fact to a murder for hire. The elements of that tort are "`"(1) public disclosure (2) of a private fact (3) which would be offensive and objectionable to the reasonable person and (4) which is not of legitimate public concern."' The latter factor relates to `newsworthiness' and is subject to a three-part test involving the social value of the published facts, the depth of intrusion into ostensibly private affairs, and whether the person acceded voluntarily to a position of public notoriety." (M.G. v. Time Warner, Inc. (2001) 89 Cal.App.4th 623, 631, 107 Cal.Rptr.2d 504, fns. omitted.)

B. Application of Section 425.16

Gates argues that Discovery, in meeting its threshold burden of showing that the challenged cause of action is one arising from a protected activity, was required to show that Gates's intent in bringing the action was to chill Discovery's free speech rights. To the contrary, there is no requirement in section 425.16 that the plaintiff have a subjective intent to chill the defendant's right of free speech or petition. (Equilon Enterprises v. Consumer Cause, Inc. (2002) 29 Cal.4th 53, 58, 124 Cal.Rptr.2d 507, 52 P.3d 685.) Discovery demonstrated Gates's suit arose from its exercise of protected constitutional rights and, therefore, section 425.16 was applicable to it.

C. Probability Gates Will Prevail

Since Discovery established that section 425.16 is applicable to Gates's action, the burden shifts to Gates to establish a probability he would prevail on his claim. Discovery makes several arguments contending Gates is unable to do so. All of these claims ultimately turn on whether Discovery's report concerning Gates was protected by the First Amendment. As noted, that issue requires we decide whether the opinion in Briscoe has been overruled by later opinions of the United States Supreme Court. Justices Kennard and Mosk in a concurring opinion in Shulman v. Group W Productions, Inc. (1998) 18 Cal.4th 200, 246, 74 Cal.Rptr.2d 843, 955 P.2d 469, express doubt that the reasoning of Briscoe survives that authority. Some commentators agree. (See, e.g., Solove, *539 Access and Aggregation: Public Records, Privacy, and the Constitution, 86 Minn. L.Rev. 1137, 1182.) We conclude that in the context of the present case Briscoe in fact cannot be followed.

1. Briscoe

In 1966 the Reader's Digest published an article about the hijacking of trucks. As an example of such crimes, the article noted a hijacking committed by Marvin Briscoe. While mentioning Briscoe by name, the article did not state that the crime was committed 11 years earlier. Briscoe was rehabilitated. In his disclosure of private facts cause of action, he conceded that the fact of his crime remained newsworthy but argued the use of his name was not. As to Briscoe's privacy action, a demurrer was sustained without leave to amend. (Briscoe, supra, 4 Cal.3d at pp. 532-533, 93 Cal.Rptr. 866, 483 P.2d 34.)
Briscoe reviewed the development of the concept of the right of privacy and fully explored the tension between it and the rights of freedom of speech and freedom of the press. While recognizing the great scope of the First Amendment, the court concluded the amendment provided particular protection for `"hot news, items of possible immediate public concern or interest." This was so because of the pressure deadlines placed on editorial judgment and because of the particular importance of such reports for the community. The court stated the identity of persons charged with crimes also had social utility. The court concluded that in general the reports of "recent crimes" and the names of the suspects or offenders were protected by the First Amendment. (4 Cal.3d at pp. 533-537, 93 Cal.Rptr. 866, 483 P.2d 34.)
The court concluded, however, the First Amendment provides less protection for reports of past crimes and the identification of past offenders. While conceding that reports of the facts of past crimes were "newsworthy," it concluded little useful purpose was served by identifying the offender. Indeed, it concluded that a strong public interest existed in keeping private the identity of past offenders since doing so preserved the "integrity of the rehabilitative process." (Briscoe, supra, 4 Cal.3d at p. 538, 93 Cal.Rptr. 866, 483 P.2d 34.)
Citing United States Supreme Court authority, Briscoe concluded that truthful publications were constitutionally protected if newsworthy. It then reviewed the elements of that concept. The court concluded that on the facts before it, a jury could conclude Briscoe's name was no longer newsworthy. A jury could conclude Briscoe had over time again become an anonymous member of the community. The court concluded Briscoe might prevail on his privacy cause of action. It stated it was for a jury to decide whether he had become a rehabilitated member of society, whether identifying him as a former criminal was highly offensive, whether Reader's Digest published the information with reckless disregard for its offensiveness and whether any independent justification existed for publishing Briscoe's name. (Briscoe, supra, 4 Cal.3d at pp. 541-543, 93 Cal.Rptr. 866, 483 P.2d 34.)
The court concluded Briscoe had pleaded a valid cause of action.

2. Subsequent United States Supreme Court Authority
After Briscoe the United States Supreme Court decided a series of cases dealing with the same broad issue of the tension between the right to privacy and the rights of free speech and free press.
In Cox Broadcasting Corp. v. Cohn (1975) 420 U.S. 469, 95 S.Ct. 1029, 43 *540 L.Ed.2d 328 (Cox), a 17-year-old woman was killed during a rape in Georgia. The crime received wide press coverage but the name of the victim was not disclosed because of a Georgia law making it a crime to publish or broadcast such information. A reporter became aware of the name of the victim when shown an indictment in the case made available to him in the courtroom. It was undisputed that the indictment was a public record available for inspection. The reporter's employer broadcast the name of the victim. The victim's father brought a privacy action. Cox argued its broadcast was privileged under the First and Fourteenth Amendments. The Georgia trial court rejected the argument, stating the Georgia statute gave a civil remedy to those injured by its violation. (Cox, supra, 420 U.S. at pp. 471-474, 95 S.Ct. 1029.)
The Supreme Court stated the issue was whether consistent with the First and Fourteenth Amendments "a State may extend a cause of action for damages for invasion of privacy caused by the publication of the name of a deceased rape victim which was publicly revealed in connection with the prosecution of the crime." (Cox, supra, 420 U.S. at p. 471, 95 S.Ct. 1029.)
The court first acknowledged a growing body of law recognizing a right to privacy. Cox argued the press could not be held criminally or civilly liable for publishing information that was neither false nor misleading. The court noted that in defamation actions truth was generally viewed as a defense. The court stated, however, it had "carefully" left open the question of whether the Constitution required that truth be recognized as a defense in a defamation action brought by a private person rather than a public figure. The court stated the same degree of caution should exist in dealing with the issue of the effect of truth on the tort of invasion of privacy. (Cox, supra, 420 U.S. at pp. 489-91, 95 S.Ct. 1029.)
In this regard, the court stated: "Rather than address the broader question whether truthful publications may ever be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments, or to put it another way, whether the State may ever define and protect an area of privacy free from unwanted publicity in the press, it is appropriate to focus on the narrower interface between press and privacy that this case presents, namely, whether the State may impose sanctions on the accurate publication of the name of a rape victim obtained from the public records  more specifically, from judicial records which are maintained in connection with a public prosecution and which themselves are open to public inspection. We are convinced that the State may not do so." (Cox, supra, 420 U.S. at p. 491, 95 S.Ct. 1029.)
The court explained that the reporting of information concerning the operation of every part of government, including the judiciary, was of great importance and entitled to strong protection. The court noted that the law of privacy recognized that the interest in privacy fades when the information involved was already in the public record. (Cox, supra, 420 U.S. at pp. 494-495, 95 S.Ct. 1029.)
The court emphasized that by putting information in an official court record, the State must presume that the public interest was being served. It stated that public records by their very nature are of interest to the public and an important benefit is performed when they are published. The court stated such reporting was important to our form of government and then concluded: "In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions *541 on the publication of truthful information contained in official court records open to public inspection." (Cox, supra, 420 U.S. at p. 495, 95 S.Ct. 1029.)
The court stated it was reluctant to embark on a course that would make public records available to the press but forbid their publication if offensive to the sensibilities of some supposed reasonable man. The court stated this would make it difficult for the press to report public business and also stay within the law. Such a rule would invite timidity and self-censorship and would lead to the suppression of matters that would otherwise be published. (Cox, supra, 420 U.S. at p. 496, 95 S.Ct. 1029.)
In Okla. Publishing Co. v. Dist. Court (1977) 430 U.S. 308, 97 S.Ct. 1045, 51 L.Ed.2d 355 (Oklahoma Publishing), delinquency charges arising from a murder were brought against an 11-year-old boy. Members of the media were present in the courtroom during the detention hearing and learned the boy's name. The name appeared in newspaper stories and in radio and television broadcasts. At a later closed hearing the trial court entered an order enjoining the press from revealing the boy's name. Oklahoma Publishing's petition for a writ to quash the order was denied by the Oklahoma Supreme Court on the basis that Oklahoma law required juvenile proceedings be held in private unless ordered open by the trial court. (Id. at pp. 308-309, 97 S.Ct. 1045.)
The United States Supreme Court reversed. Citing Cox and other cases, it held that the existence of a state statute requiring closed juvenile hearings was irrelevant since members of the press had lawfully been present at a hearing where the boy's name was revealed. The court noted the name was revealed in connection with "`the prosecution of the crime,' [citation], much as the name of the rape victim in [Cox ] was placed in the public domain." (Oklahoma Publishing, supra, 430 U.S. at p. 311, 97 S.Ct. 1045 fn. omitted.) The Supreme Court found the trial court's order unconstitutional. (Id. at pp. 311-312, 97 S.Ct. 1045.)
In Smith v. Daily Mail Publishing Co. (1979) 443 U.S. 97, 99 S.Ct. 2667, 61 L.Ed.2d 399 (Daily Mail), a 15-year-old student was shot and killed by a 14-year-old classmate in West Virginia. Newspaper reporters learned the classmate's name from eyewitnesses to the crime. The assailant's name was published in the newspaper. Indictments were returned, alleging that the publication of the assailant's name violated a West Virginia statute making it a crime to publish the name of any child connected with a juvenile proceeding without court permission. The West Virginia Supreme Court found the statute unconstitutional as a prior restraint on the freedom of the press. (Id. at p. 98, 99 S.Ct. 2667.)
The United States Supreme Court stated the issue of whether the West Virginia law was a prior restraint was not determinative. It stated that whether the statute was a prior restraint or a penal sanction for the publication of lawfully obtained truthful information, any justification required a showing that the State's action furthers a state interest of the "highest order." The State argued its interest was maintaining the juvenile's anonymity as a means of promoting rehabilitation. The court concluded this was not an interest of the highest order. (Daily Mail, supra, 443 U.S. at pp. 101-106, 99 S.Ct. 2667.)
In The Florida Star v. B.J.F. (1989) 491 U.S. 524, 109 S.Ct. 2603, 105 L.Ed.2d 443 (The Florida Star), the court again visited the issue of the criminalization of the disclosure of the name of sex crime victims. A Florida statute made it unlawful to publish the name of the victim of a sexual *542 offense. A report of a rape including the name of the victim was inadvertently released to the press by the police department and The Florida Star newspaper printed it. The rape victim sued the newspaper for printing her name in violation of the non-disclosure statute. The trial court found the newspaper negligent per se and a jury awarded the plaintiff $100,000 in damages. (Id. at pp. 526-529, 109 S.Ct. 2603.)
The Supreme Court noted the case again raised the issue of the tension between the freedom of the press and the right of individuals to maintain the privacy of even truthful information. The court noted that while it had addressed this tension in Cox, Oklahoma Publishing and Daily Mail, its approach had been to deal with the discrete factual context of each case and therefore it had not exhaustively considered the issue. (The Florida Star, supra, 491 U.S. at pp. 530-531, 109 S.Ct. 2603.)
The Florida Star argued that the trilogy of prior cases produced the rule that the press may never be punished civilly or criminally for publishing the truth. The plaintiff countered that in each of the trilogy cases the information published was already in the public record and the privacy interest in those earlier cases was far less profound than in hers. The court concluded that imposing damages on The Florida Star for publishing the plaintiffs name violated the First Amendment. (The Florida Star, supra, 491 U.S. at pp. 531-532,109 S.Ct. 2603.)
The court first noted that Cox, while superficially similar, was not directly controlling. Cox dealt with the publication of the name of a sex crime victim that was already contained in the public record of a judicial proceeding. The court noted Cox emphasized the "`special protected nature of accurate reports of judicial proceedings.'" (The Florida Star, supra, 491 U.S. at p. 532, 109 S.Ct. 2603.) The court observed this status existed because of the special role the press plays in subjecting trials to public scrutiny and thus helping to maintain their fairness. The plaintiffs name published by The Florida Star did not come from the public record of a judicial proceeding since there was no such proceeding at the time of publication. (Ibid.)
The court also rejected any rule that truthful publications may never be punished. It noted the court had carefully avoided such a pronouncement, concluding that given the issues involved, it was better to treat situations as they arose and not declare categorical directives. Instead, the court crystallized a flexible rule first suggested in Daily Mail, "`[I]f a newspaper lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order.' [Citation.]" (The Florida Star, supra, 491 U.S. at pp. 532-534, 109 S.Ct. 2603.)
The court stated such a rule giving great protection to the publication of lawfully obtained truthful information was justified by at least three considerations. First, the government has sufficient means in most cases to sufficiently protect confidential information without punishing its publication. (The Florida Star, supra, 491 U.S. at p. 534, 109 S.Ct. 2603.) Next, it does little to protect the right of privacy to punish the publication of information already available to the public. In this regard, the court stated: "It is not, of course, always the case that information lawfully acquired by the press is known, or accessible, to others. But where the government has made certain information publicly available, it is highly anomalous to *543 sanction persons other than the source of its release." (Id. at p. 535,109 S.Ct. 2603.) The court continued: "[I]t is a limited set of cases indeed where, despite the accessibility of the public to certain information, a meaningful public interest is served by restricting its further release by other entities, like the press. As Daily Mail observed in its summary of Oklahoma Publishing, `once the truthful information was "publicly revealed" or "in the public domain" the court could not constitutionally restrain its dissemination.' [Citation.]" (Ibid.) Finally, the court noted that punishing truthful information lawfully obtained could result in a harmful "`timidity and self-censorship'" on the part of the press. (Ibid.)
In finding that allowing damages against The Florida Star for publishing the sex crimes victim's name was unconstitutional, the court addressed the issue of what is a "public interest of the highest order." It noted that the plaintiff claimed three interests advanced by Florida's non-disclosure law, the privacy of victims, the physical safety of victims and the encouragement of victims to report offenses. The court found these interests highly significant but, under the facts of the case before it, not of the highest order. The court noted the information was provided to the newspaper by the government, under Florida law the publication amounted to per se negligence and the non-disclosure was underinclusive in that it applied only to "`instruments of mass communication.'" (The Florida Star, supra, 491 U.S. at pp. 536-541, 109 S.Ct. 2603.)
In Bartnicki v. Vopper (2001) 532 U.S. 514, 121 S.Ct. 1753, 149 L.Ed.2d 787, the court dealt with the protection, if any, given by the First Amendment to the disclosure of the contents of an illegally intercepted communication. In that case the media was provided and published the contents of illegally intercepted cellular telephone conversations between a teacher's union president and the union's labor negotiator concerning collective bargaining matters. The officials sued various members of the media who published the intercepted communications, noting that such interceptions were illegal under state and federal law and that it was illegal for anyone to disclose the content of such communication who knew or has reason to know it was illegally intercepted. (Id. at pp. 518-519,121 S.Ct. 1753.)
In addressing the issue the court began by assuming that the media defendants were aware the recordings were of illegally intercepted communications and that disclosing their content was illegal. The court also noted that the media defendants lawfully obtained tapes of the conversation even though they knew the information was itself illegally intercepted. The court further found that the content of the tapes was of public concern. (Bartnicki v. Vopper, supra, 532 U.S. at pp. 524-525, 121 S.Ct. 1753.)
The court noted the rule that absent a need of the highest order a State may not punish the publication by a newspaper of truthful information lawfully obtained. It was argued that the State had two such interests, removing the incentive to intercept conversations and the interest in minimizing harm to persons whose conversations were intercepted. The court stated these interests met the constitutional test with regard to the person who illegally intercepted the conversation. It quickly rejected, however, the argument that an interest in removing the incentive to intercept applied to one who later lawfully obtained and disclosed of the information. (Bartnicki v. Vopper, supra, 532 U.S. at pp. 529-532,121 S.Ct. 1753.)
The court stated that the issue of whether the states had a sufficiently high interest *544 in protecting the privacy of those whose conversation was intercepted was a more difficult question. The court noted that allowing the disclosure of such intercepted conversations might have a chilling effect on private speech. The court concluded, however, under the facts before it, criminalizing disclosure of the conversations implicated the core purpose of the First Amendment because it punished the publication of truthful information of public concern. (Bartnicki v. Vopper, supra, 532 U.S. at pp. 532-533, 121 S.Ct. 1753.)

3. Shulman

Between the decisions in The Florida Star and Bartnicki the California Supreme Court addressed the tension between First Amendment speech and press rights and the right to privacy in a context different than that addressed by Briscoe or the cited United States Supreme Court cases.
Shulman v. Group W Productions, Inc., supra, 18 Cal.4th 200, 74 Cal.Rptr.2d 843, 955 P.2d 469, involved privacy actions by two automobile accident victims. The rescue of the two and the emergency medical attention given them was videotaped by a production company and was broadcast as part of a television documentary series involving such incidents. The victims sued, raising two causes of action for invasion of privacy: one based on unlawful intrusion and the other based on the public disclosure of private facts during the broadcast. The production company moved for summary judgment, arguing their conduct was protected by the First Amendment since the incident was newsworthy. (Id. at pp. 210-212, 74 Cal. Rptr.2d 843, 955 P.2d 469.)
In dealing with the disclosure of private facts cause of action, the court noted that an element of the tort is that the fact disclosed not be of legitimate public interest, i.e., not newsworthy. The court conducted a detailed review of case authority on the issue. The court noted that the issue of newsworthiness had not been given extensive attention by the United States Supreme Court. The court reviewed Cox and The Florida Star but noted they did not provide broad guidance on the issue of privacy and in particular not on the issue of newsworthiness. The court emphasized those cases dealt with public records made available to the press. (Shulman v. Group W Productions, Inc., supra, 18 Cal.4th at pp. 214-218, 74 Cal. Rptr.2d 843, 955 P.2d 469.)
The court conducted a detailed analysis of the jurisprudential issues involved and California case authority on the matter. As part of that review the court summarized its decision in Briscoe and noted its conclusion that while the facts of Briscoe's 11-year-old crime remained newsworthy, identification of him as the criminal did not. The court reviewed the factors that led to its conclusion and the balancing of interests approach that led to that conclusion. (Shulman v. Group W Productions, Inc., supra, 18 Cal.4th at pp. 221-222, 74 Cal.Rptr.2d 843, 955 P.2d 469.)
The court concluded that the subject matter of the broadcast as a whole was of legitimate public concern. The court stated the more difficult question was the newsworthiness of images of the victims being rescued and treated. The court found such images newsworthy as a matter of law.

4. Analysis
Given the importance and complexity of the issues involved, the United States Supreme Court has, in dealing with the matter broadly, consciously avoided pronouncing a categorical rule to resolve the inherent tension between the right to privacy and rights secured by the First *545 Amendment. Thus, the court has refused to hold that the First Amendment always protects the publication of lawfully obtained truthful information of public significance. Instead, in general, the court allows criminal or civil punishment for such publication when there is a countervailing state interest of the highest order.
However, in Cox the court, addressing a particular area of tension between the right of privacy and the First Amendment, categorically declared that no sanction may be imposed on the publication of truthful information contained in an official record open to public inspection. The court stated: "At the very least, the First and Fourteenth Amendments will not allow exposing the press to liability for truthfully publishing information released to the public in official court records. If there are privacy interests to be protected in judicial proceedings, the States must respond by means which avoid public documentation or other exposure of private information. Their political institutions must weigh the interests in privacy with the interests of the public to know and of the press to publish. Once true information is disclosed in public court documents open to the public inspection, the press cannot be sanctioned for publishing it. In this instance as in others reliance must rest upon the judgment of those who decide what to publish or broadcast. [Citation.]" (Cox, supra, 420 U.S. at pp. 496, 95 S.Ct. 1029.) In Briscoe our Supreme Court held to the contrary. It concluded an actionable violation of privacy could arise from such a publication if a weighing of factors and a balancing of interests indicated the right of privacy was paramount.
An important element of that balancing process in Briscoe was that 11 years had passed between Briscoe's commission of a crime and the publication of his name as the criminal. The court found that factor significant based on its conclusion that the First Amendment protects more strongly the contemporaneous reports of crimes and criminal proceedings and to protect the integrity of the rehabilitative process.
On matters of federal constitutional law we are bound by the decisions of the United States Supreme Court. (People v. Bradley (1969) 1 Cal.3d 80, 86, 81 Cal. Rptr. 457, 460 P.2d 129; Wagner v. Apex Marine Ship Management Corp. (2000) 83 Cal.App.4th 1444, 1451, 100 Cal.Rptr.2d 533.) There is no suggestion in Cox that the fact the public record of criminal proceeding is one or two or ten years old affects the absolute right of the press or a documentarian or a historian to report it fully. (See generally Shulman v. Group W Productions, Inc., supra, 18 Cal.4th at p. 246, 74 Cal.Rptr.2d 843, 955 P.2d 469, concurring opinion of Kennard, J.) To require journalists, historians or documentarians to make subjective judgments balancing the right of the public to know against, for example, the right of a convicted and perhaps rehabilitated felon to some degree of privacy would promote the type of self-censorship and timidity the United States Supreme court is not willing to accept. The core of Cox is that the State cannot make the record of a judicial proceeding fully public and then sanction a publication of it. The State of California took no action in the name of privacy or criminal rehabilitation to seal the record of Briscoe's crime. It was at the time of the publication of the Reader's Digest article as public as it had been the day of Briscoe's conviction. We are led to the conclusion that insofar as Briscoe held that criminal or civil penalties could result from the publication of the public record of a judicial proceeding, it was overruled by Cox.
Gates's invasion of privacy action is based on Discovery's disclosure that he was convicted of being an accessory after *546 the fact to a murder for hire. The disclosure was a truthful report of information in the public record of a judicial proceeding and was privileged under the First Amendment. Gates, therefore, cannot prevail on his privacy action and the trial court erred in denying Discovery's motion to strike.[3]
The order denying the motion to dismiss the privacy cause of action is reversed.
WE CONCUR: KREMER, P.J., and McINTYRE, J.
NOTES
[1] The acronym "SLAPP" stands for Strategic Lawsuits Against Public Participation.
[2] Unless otherwise noted all code references are to the Code of Civil Procedure.
[3] Gates alleged one invasion of privacy cause of action. In his complaint he states the basis for his claim was "the revelation that Plaintiff plead guilty to being an accessory after the fact to a murder for hire plot and airing by Defendants of Plaintiff's photograph." The general term invasion of privacy refers to four separate torts. Gates's cause of action clearly asserts one of them, i.e., the public disclosure of private, offensive or objectionable facts. However, Gates asserts, at least on appeal, a second privacy tort, appropriation of his likeness. This tort, which supports both a common law and complimentary statutory cause of action (Civ.Code, § 3344, subd. (a)) has two forms. The form arguably applicable here is very similar to the public disclosure of private facts privacy action but involves a claim that the appropriation of one's name or likeness caused injury to the feelings. (Dora v. Frontline Video, Inc. (1993) 15 Cal.App.4th 536, 541-546, 18 Cal.Rptr.2d 790.)

Assuming under the facts of the present case that an appropriation of likeness cause of action has any force separate from a public disclosure of private facts action, we conclude Gates cannot establish a probability he would prevail on the claim. Such causes of action raise First Amendment issues. Both the common law and statutory forms of the action are defeated by a showing that publication of the likeness was in the public interest. This includes publications designed to entertain or to inform the public concerning past events. (Dora v. Frontline Video, Inc., supra, 15 Cal. App.4th 536, 541-546, 18 Cal.Rptr.2d 790.)
In Dora v. Frontline Video, Inc., the plaintiff was a "legendary" ocean surfer from the 1950's. In 1987 defendant produced a documentary about surfing using audio and video footage of plaintiff. Plaintiff stated he consented to none of this and sued for unauthorized use of his name, voice and likeness. The court upheld the grant of summary judgment as to both plaintiff's common law and statutory causes of action, finding the publication of plaintiff's likeness, etc., a matter of public interest. (15 Cal.App.4th at pp. 540, 543-544, 544-545, 18 Cal.Rptr.2d 790.)
Gate's causes of action for appropriation is less defensible than that of the plaintiff in Dora. It is not probable he would prevail on those causes of action and they are properly dismissed under the Anti-SLAPP statute.