355 So.2d 21 (1978)
Michael G. NORRIS, Plaintiff-Appellee,
v.
Brian KING, Defendant-Appellant.
No. 6007.
Court of Appeal of Louisiana, Third Circuit.
January 16, 1978.
Dissenting Opinion January 17, 1978.
Rehearing Denied March 1, 1978.
Brame, Bergstedt & Brame by Bret L. Barham, Lake Charles, David A. Sheffield, Alexandria, for defendant-appellant.
Kramer & Davis by Bernard Kramer, Alexandria, for plaintiff-appellee.
*22 Before HOOD, FORET and HEARD, JJ.
FORET, Judge.
This suit was instituted by Michael G. Norris against Brian King alleging that King's action in erecting a bulletin board in his place of business, upon which were placed photographs of the plaintiff taken while he was in the act of committing a theft upon the defendant's premises and which also contained captions referring to the subsequent guilty plea entered by Norris for the commission of the theft, caused him embarrassment, humiliation and constituted harassment. Judgment was rendered in favor of Michael Norris, and defendant, Brian King, appealed. Plaintiff, Michael Norris, has answered the appeal asking that the award of damages be increased.
Plaintiff, Michael Norris, was arrested for the theft of money taken from a Coke machine located in a washateria in the City of Alexandria which is owned by defendant, Brian King. On November 5, 1974, Michael Norris pled guilty to the charge of theft in the Alexandria City Court. For the commission of the theft, Norris was given a $100.00 fine, a suspended jail sentence, and was placed on probation for a period of one year.
During the above mentioned theft, photographs were taken of Norris and an alleged accomplice by means of a hidden security camera located in the washateria. Subsequent to the guilty plea entered by Norris, defendant, Brian King, erected in his washateria a bulletin board upon which he posted two photographs of Michael Norris and one photograph of his alleged accomplice taken during the commission of the theft. Posted at the top of the bulletin board was the following printed heading:
"CAUGHT IN THE ACT!
THESE ARE ACTUAL PHOTOGRAPHS TAKEN BY HIDDEN CAMERAS OF A THEFT IN PROGRESS."
Immediately below this heading was a typewritten caption which read:
"ANY THIEVES OR VANDALS OPERATING ON THIS PRIVATE PROPERTY SHOULD REMEMBER TO SMILE. . . THEY'LL BE ON CANDID CAMERA!"
Immediately below this caption were two typewritten captions printed on cut out arrows, each of which pointed to one of the photographs taken of Norris and which read:
"HMMMM . . . HERE WE HAVE MICHAEL NORRIS OF RT. 1 BOX 556, PINEVILLE, LOUISIANA.
MICHAEL IS CAREFULHE WANTS TO BE SURE NO ONE IS WATCHING!"
"WOW . . . MICHAEL IS SWIFTIF HE RUNS FAST ENOUGH WHILE HOLDING THE MONEY BOX WITH BOTH HANDSMAYBE HE WON'T GET CAUGHT."
Immediately following the above two captions was another caption which stated:
"TOO BAD . . . MICHAEL ISN'T FASTER THAN OUR CAMERAS!
AND MICHAEL ISN'T FASTER THAN THE POLICE!
MICHAEL PAYS THE COURT $105.00
MICHAEL GETS 91 DAYS IN JAIL (suspended)
MICHAEL MUST REPORT TO A PROBATION OFFICER FOR 1 YEAR
MICHAEL NOW HAS A POLICE RECORD"
Below the caption immediately quoted above was located a photograph of the alleged accomplice in the theft and located to the left of this photograph was the following typewritten caption which was placed on an arrow pointing to the alleged accomplice's photograph:
"WELL . . . ANOTHER ONE!
THE POLICE SAY THIS SPECIMEN IS NONE OTHER THAN MARVIN SHARP OF RT. 1, BOX 181, PINEVILLE, LOUISIANA, THE POLICE SAY MARVIN WAS WITH MICHAEL NORRIS DURING THE ABOVE THEFT.
WAS MARVIN AN ACCOMPLICE?
WAS MARVIN A LOOKOUT?

*23 WHAT WILL THE JUDGE SAY?
WHEN WILL HIS TRIAL BE HELD?
WHAT WILL HAPPEN TO MARVIN?"
Norris brought suit against Brian King alleging that the publication of the photographs and captions referring to the theft and subsequent guilty plea caused him considerable humiliation and embarrassment and constituted undue harassment. The trial court rendered judgment in favor of Norris in the amount of $500.00 and permanently enjoined the defendant, Brian King, from further publicizing in any manner the arrest and conviction of Michael Norris.
The trial judge stated that the issue facing the Court was whether the actions of Brian King constituted an unlawful invasion of the "Right of Privacy" of the plaintiff, Michael Norris. He further stated that the award was to compensate the plaintiff both for the improper use of his name and picture on the bulletin board and for any over-zealous attempts to collect for the damages resulting from the theft.

ISSUES
A. Did the actions of Brian King constitute an invasion of the privacy of Michael G. Norris?
B. Does the holding of the trial court violate the rights of Brian King which are guaranteed by the First Amendment to the United States Constitution?
Defendant denies that he displayed the pictures to pressure the plaintiff into making restitution. We find difficulty in reconciling that contention of the defendant with the fact that he delayed six or seven months before posting the pictures in his place of business. The defendant stated that his purpose in displaying the pictures was to discourage or deter others from burglarizing his place of business. When questioned on cross-examination as to why he could not have omitted the name and address of the plaintiff, and/or have blacked out the identifiable facial features of the plaintiff, defendant replied that the desired effect of the publication would have been lost, because they would not appear as authentic, and therefore be of less benefit to the defendant.
The cause of action known as "invasion of privacy" has long been recognized and pronounced by the jurisprudence of this State.[1]Tooley v. Canal Motors, Inc., 296 So.2d 453 (La.App. 4 Cir. 1974) described the right of privacy as follows:
". . . `the right to be let alone' and as `the right to live one's life in seclusion without being subjected to unwarranted and undesirable publicity'."
. . . . .
"As appears from the cited cases and as discussed at length in the Comment at 28 La.Law Rev. (April 1968) malicious intent on the part of the defendant is not a necessary element in the prosecution of an invasion of privacy claim. If the defendant's conduct is unreasonable and seriously interferes with plaintiff's privacy the invasion is actionable."
This tort has usually been associated with conduct falling into one or more of the following classifications:
(1) Intrusion (Lucas v. Ludwig, 313 So.2d 12 (La.App. 4 Cir. 1975), certiorari denied, 318 So.2d 42 [La.]);
(2) Public disclosure of private facts (Lambert v. Dow Chemical Co., 215 So.2d 673 (La.App. 1 Cir. 1968); Hamilton v. Lumbermen's Mutual Cas. Co., 82 So.2d 61 (La.App. 1 Cir. 1955);
(3) False light in public eye (Tooley v. Canal Motors, Inc., supra);
(4) Appropriation of another's name (Tooley v. Canal Motors, Inc., supra; McAndrews v. Roy, 131 So.2d 256 (La.App. 1 Cir. 1961).
See also Prosser, 48 Calif.Law Review, 383.
We are unable to find, and nor was any case in this State or any other state cited to us, wherein the issue involved herein was met squarely. In Briscoe v. Reader's Digest Association, 4 Cal.3d 529, 93 Cal. *24 Rptr. 866, 483 P.2d 34 (1971), the California Supreme Court was faced with a conflict between the right of freedom of the press and the right to privacy. The trial court in the case at bar had this to say in reference to Briscoe:
"Without quoting extensively from that opinion, it suffices to say that the court concluded that one of the major objectives of society and of the administration of our penal system is the rehabilitation of the fallen. Where a person has rehabilitated himself, he should be permitted to continue in the path of rectitude rather than be thrown back into a life of shame or crime. The court pointed out that even the thief on the cross was permitted to repent during the hours of his final agony. The court went on to say that:
`One of the premises of the rehabilitative process is that the rehabilitated offender can rejoin that great bulk of the community from which he has been ostracized for his anti-social acts. In return for becoming a "new man" he is allowed to melt into the shadows of obscurity.'
"The California court then went on to hold that it is for the trier of fact to determine (1) whether the plaintiff has become a rehabilitated member of society, (2) whether identifying him as a former criminal would be highly offensive and injurious to the reasonable man, (3) whether defendant published its information with a reckless disregard for its offensiveness, and (4) whether any independent justification for printing plaintiff's identity existed. This Court accepts the above test and applying it here finds that the plaintiff has married and become a rehabilitated member of society, that the defendant's conduct is highly offensive and injurious to the reasonable man, that the defendant published the information with total disregard for its offensiveness and that there is not sufficient independent justification for defendant's act.
"A factor to be considered in making the above determination and in assessing damages is the recentness of the criminal offense. There seems little doubt that the defendant was entitled to truthfully discuss this criminal act and even to publish it on the bulletin board in his business. However, this Court feels that as of the filing of this suit the plaintiff had rehabilitated himself and that the continued publication of his offense served no public interest. It is extremely difficult if not impossible to point out an exact time after which the defendant's conduct was legally impermissible. It is also difficult to allocate the embarrassment and humiliation which the plaintiff suffered between the period when the publication was permissible and the period thereafter. All things considered, the Court feels that an award of $500.00 would adequately compensate the plaintiff both for this improper use of his name and the picture on the bulletin board and for any overzealous attempts to collect for damages resulting from the criminal act."
In addition to awarding the monetary damages hereinabove mentioned, the trial court also permanently enjoined the defendant, Brian King, from publicizing in any manner the arrest and conviction of the plaintiff, Michael G. Norris.
Defendant cites several United States Supreme Court decisions for his contention that the conduct did not constitute an invasion of privacy and that the ruling of the trial court violated defendant's Constitutionally-guaranteed freedoms of speech and press. However, without going into an extensive discussion of the various cases cited by defendant-appellant, we find these cases not applicable to the case at bar. These cases cited by defendant-appellant all involve publication by either the news media, or by some other organization acting in the public interest. This case involves a publication by one individual, involving information concerning another individual. The cases cited by defendant-appellant involve the privilege and/or responsibility of the news media to openly publish, and this case involves a private citizen's right and privilege to do so. The responsibilities of the news media are very different from those of the individual citizen. The whole purpose *25 and aim of the news media is to bring forth information to the public, to apprise the public of the events transpiring from day to day. That responsibility, duty, and purpose are not shared by the ordinary individual. At least no cases to the contrary have been brought to our attention by defendant-appellant.
The facts of this case illustrate the repeated harassment by defendant King of plaintiff and his family. That harassment was unreasonable, and seriously interfered with plaintiff's privacy. Accordingly, the invasion is actionable. Tooley v. Canal Motors, Inc., supra. Instead of pursuing restitution in a civil proceeding, defendant King instead chose to telephone plaintiff and his mother and make threats to plaintiff, the mother, and the integrity of the entire family. When these threats did not produce the results which he sought, defendant finally chose to display the photographs of plaintiff in a manner most ridiculing to plaintiff, and to announce to the world that plaintiff had been convicted of a crime, in a manner motivated by reasons which would continuously enure to defendant's benefit (and to plaintiff's detriment) by aiding defendant in safeguarding his property from theft, etc.
We are unable to discern any public interest to be served by defendant's actions such as to bring him within the protection of the rights of free speech and press. Any such right that he might have had were lost to him when his motives evolved into continued punishment and harassment of the plaintiff; and his selfish motive of protection of his property became the main motivation for his continued publication of plaintiff's picture and the information pertinent thereto.
It appears obvious, from the record, that one of defendant's motives in displaying plaintiff's picture in defendant's washateria was to coerce payment of that which defendant claims that plaintiff took from him. Accordingly, the Louisiana jurisprudence dealing with the extent to which a creditor may apply pressure on a debtor should be examined.
A creditor may employ any reasonable, non-coercive methods in an attempt to collect that which is owed to him. However, when he oversteps the bounds of propriety and takes unreasonable, coercive action, he has committed tortious conduct for which the law provides a remedy. In the following cases it was found that the conduct of the defendant-creditor was actionable: Tuyes v. Chambers, 144 La. 723, 81 So. 265 (1919) (the defendant printed and published plaintiff's name on a list of delinquent debtors); Booty v. American Finance Corp. of Shreveport, 224 So.2d 512 (La.App. 2 Cir. 1969) (the defendant sent a series of lettersno less than tento plaintiff's employer informing it of the status of its employee's debt; creditor telephoned the office of employer and requested assistance in the collection of the debt; agents of the defendant told plaintiff that they would have him fired from every job until he left town); Boudreaux v. Allstate Finance Corp., 217 So.2d 439 (La.App. 1 Cir. 1968) (the creditor telephoned plaintiff's neighbors and characterized plaintiffs as deadbeats, apprised the neighbors of plaintiff's delinquency in payment of the debt due defendant); Pack v. Wise, 155 So.2d 909 (La.App. 3 Cir. 1963), writ refused 245 La. 84, 157 So.2d 231 (the defendant-creditor contacted plaintiff's employer of an alleged delinquent indebtedness; he telephoned the employer and explained the situation; he furnished the employer with a letter received by him from plaintiff's attorney informing him of potential litigation were he to continue his collection efforts; plaintiff was fired as a result of the foregoing). See also Malone, 25 La.Law Rev., 341 (1965).
Plaintiff has answered this appeal seeking an increase in the damages awarded by the trial court. While the award may be somewhat low, we do not find it to be outside of the perimeters of Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976). Accordingly, we will not disturb the award.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of *26 this appeal are assessed against defendantappellant, King.
AFFIRMED.
HOOD, J., dissents and assigns written reasons.
HOOD, Judge (dissenting).
I disagree with some of the conclusions which were reached by my colleagues in this case. I would affirm that part of the trial court judgment which enjoins defendant from further publicizing the conviction of plaintiff. I would reverse that part of the judgment appealed from, however, which condemns defendant to pay damages to plaintiff.
Some of the facts are presented in the majority opinion, but I think the most significant facts essential to a proper disposition of this case were omitted. For that reason I am stating here some of the important facts which obviously were overlooked by my colleagues. Practically all of these facts are uncontradicted.
Defendant King has been managing a washateria in Alexandria since about 1970. From 1970 until 1974, a period of less than four years, many thefts and serious crimes were committed in and around his place of business. At least 36 known thefts were committed in his washateria during that time. Most of those thefts were of clothes and money from Coke machines, but they also included thefts of pieces of furniture, a baby crib, rolling baskets, plumbing fixtures and cases of Cokes. At least ten complete cases of Cokes were stolen from the washateria. On one occasion a purse was taken from a woman while she was in defendant's place of business. At another time, defendant caught two persons in the act of stealing clothes and bottles, and he held them physically until the police arrived. Besides the thefts which were actually committed, the evidence shows that a number of attempted thefts also occurred in the washateria during that time. The locks on defendant's washing machines were damaged many times in the course of those attempted thefts.
In addition to the thefts which occurred in the washateria, several other serious crimes were committed in that immediate neighborhood. These included a nighttime robbery of the nearby Bonanza Steak House in 1974, the robbery of a service station where the attendant was severely beaten, and a daylight armed robbery of a neighboring business after which the offenders ran by plaintiff's washateria in making their escape. In another instance, the owner of a business located adjacent to the washateria was held at gunpoint by thieves who were attempting to break into a jewelry store.
King was justifiably alarmed by the many crimes which were being committed in and around his place of business, so for his own protection he took some security measures. These included his participation in a security patrol service whereby his washateria was checked by patrol officers at regular intervals. On one occasion he employed detectives to maintain a stake-out to catch offenders. He painted the coin boxes on his machines with special paint so that they could be identified easily, and he used fluorescent powder on those boxes to assist in obtaining finger prints. These security measures, however, did not noticeably reduce the number of thefts which were committed or attempted in his place of business.
In October, 1973, as another security measure, King installed a camera in the washateria which he felt would help in apprehending those who committed thefts there. The camera could be seen by anyone in the washateria, and the fact that it was there apparently brought about some reduction in the number of thefts committed after it was installed. Despite the presence of the camera, however, other thefts and many attempted thefts were committed while it was there, and the locks on defendant's washing machines were damaged during those attempts.
On three different occasions, within one year after the camera was installed, adequate pictures were obtained of persons committing thefts in the washateria. On *27 the first two occasions pictures were obtained of a person named Rex Countee committing thefts. By means of those pictures Countee was identified, and after being apprehended he confessed that he had committed those thefts, and that he had committed several other thefts in the washateria which had not been photographed by the camera. Charges were filed against him for committing a total of seven thefts of that place of business. He pleaded guilty to all of those charges and was sentenced by the court. Thereafter he made restitution to King of all the moneys he had stolen from him.
The third occasion on which the camera functioned properly was in October, 1974, or about one year after it was installed, when a theft was committed in the washateria by plaintiff Norris and by an accomplice named Marvin Sharp. The camera managed to get pictures of Norris and Sharp while they were in the act of committing the theft, and both of those offenders were identified through those photographs. Charges were filed against them, and Norris was arraigned in November, 1974. He pleaded guilty to the charge which was filed against him, and he was sentenced by the court. The record does not show whether his accomplice, Sharp, has been arraigned or has been sentenced.
The court records relating to the charges against Norris and Sharp, including the plea of guilty which was entered by Norris and the sentence which was imposed on him, are public records which are available to anyone.
After the apprehension of Countee, Norris and Sharp, and the sentencing of the first two named offenders, there was a decrease in the number of thefts committed in defendant's place of business. The evidence shows, however, that a number of attempted thefts were committed in the washateria after that time, but the pictures taken by the camera were not clear enough for the offenders to be identified.
In April, 1975, or about five months after Norris was sentenced, some more thefts were attempted in the washateria, during the course of which three machines owned by defendant were damaged. The offenders were not detected. Immediately following those incidents King decided that, as another measure designed to reduce thefts in his establishment, he would display in his place of business pictures of the three people who had been photographed in the act of committing thefts. He hoped that that would serve as a deterrent to other wouldbe thieves. King stated "I just had to do something because of the increase in what was going on."
In April or May, 1975, therefore, shortly after three of his machines were damaged, defendant erected in his washateria two separate bulletin boards, about equal in size, which faced in opposite directions. On one of those boards, he displayed three pictures of Countee, with labels giving Countee's name and address, explaining how he committed two thefts in the washateria on separate days, and stating that Countee had pleaded guilty to the charges and had been sentenced. One of those labels contained the statement that "Rex paid an additional $40.00 for stolen property." Defendant explained that that payment constituted restitution to King of the amount which Countee had stolen. The labels on the bulletin board showed, therefore, that Countee had made full restitution before his pictures were publicized.
On the other bulletin board, King displayed two pictures of Norris and one of his accomplice, Marvin Sharp. That display also included labels giving Norris' name and address, explaining how he committed the theft and stating that Norris had been sentenced and that he now has a police record. On the same bulletin board, opposite Sharp's picture, there was a label giving Sharp's name and address, containing statements showing that Sharp was an accomplice in committing the theft, and showing that criminal charges had been filed against him.
The majority opinion correctly describes the pictures and labels which were posted on one of the above bulletin boards, that is the bulletin board which contained the display *28 relating to plaintiff Norris. Not a word is mentioned in the majority opinion, however, about the other bulletin board, that is the one that was devoted entirely to describing the thefts committed by Rex Countee. The majority obviously did not consider the fact that defendant displayed pictures and information about Countee and Sharp, as well as those relating to Norris, on the bulletin boards. I think that is a significant fact which should have been considered.
My colleagues have held that one of King's motives in erecting the bulletin boards was "to coerce payment of that which defendant claims that plaintiff (Norris) took from him." I do not think that is a valid issue, since the majority apparently concedes, and the evidence shows, that King had another motive which clearly justified the display. I also feel strongly that the evidence shows that King did not have any such motive. Assuming that it is a valid issue, however, I believe that the majority has erred in considering only a part of the evidence.
I suggest at least six serious errors which my colleagues have made in deciding this case.
One such error is the majority's failure to consider the fact that Countee had already made restitution of the amount which he had stolen, and that defendant had no claim at all against him when the bulletin boards were erected. King thus could have had no motive in displaying Countee's picture, other than to help in reducing the number of thefts in his washateria. Yet, the display on the bulletin board relating to Countee was more prominent than was the one which related to plaintiff Norris. The majority does not attempt to explain, and I submit that it cannot do so with any degree of logic, why King displayed Countee's pictures so prominently on a bulletin board, if his motive was to coerce Norris into making restitution of the money which the latter had stolen. The only plausible explanation which can be given for his act in displaying all of the pictures, including those of Norris, is that it was done to deter other wouldbe-thieves.
A second error is the majority's failure to note that a picture of Sharp also was included on the same bulletin board as that which contained pictures of Norris. King never made a demand on Sharp, and no one has suggested that he was trying to coerce Sharp into making a payment to him. One of Norris' complaints, in fact, is that King did not look to Sharp for recovery of a part of his loss. The majority did not, and it cannot, logically explain why King included Sharp's picture on the same bulletin board as that containing Norris' picture, if his motive in fact was to coerce Norris into paying money to him.
A third error was made by my colleagues in overlooking the fact that the money which was stolen by Norris was very small, and under no circumstances could defendant's claim for that small amount justify the erection of two bulletin boards and arranging displays on them. King estimated that Norris had stolen the total sum of $50.00. Norris thinks it was less than that amount, and his parents offered to make restitution of $25.00. The evidence does not show the cost of erecting the two bulletin boards which were used by defendant, but it is obvious that the expense of erecting those boards was substantially more than the full amount of any possible claim which King might have had against Norris. It is unreasonable, I think, to hold that King used such an elaborate and expensive means to coerce the payment by Norris of such an insignificant amount.
The fourth error made by the majority was in failing to consider the fact that King had taken several security measures prior to the erection of the bulletin boards in an effort to deter crime in his washateria. The erection of those bulletin boards was consistent with the earlier steps he had taken. It clearly was another security measure, and it was the only such measure which proved to be successful. After the bulletin boards were erected in defendant's washateria, not a single theft has been committed or attempted in that establishment. Defendant King testified that "The time *29 when all crimes ceased was when the display went up," and that there have been "absolutely zero" crimes since that time.
The fifth error made by my colleagues is in failing to consider the fact that no request was ever made by plaintiff Norris, or by either of his parents or by his attorney, for the removal of the display. All of them knew that the display was in the washateria, because plaintiff testified that he went to that establishment and saw it when it was first erected. There is some evidence to the effect that plaintiff's employer asked King to take down the display on one occasion, but that was only a casual request and it was not made in behalf of plaintiff or any members of his family. The first demand for removal of the display which was made in behalf of plaintiff was communicated to defendant King by the filing of the instant suit. It is manifestly unjust, I think, to allow plaintiff to recover damages from King because of the display, after plaintiff had remained silent and had acquiesced in the existence of the bulletin boards, without protest, until the suit was filed.
The sixth error made by my colleagues is in holding that defendant's actions constituted "harassment" of plaintiff and his family. The evidence shows that King never contacted plaintiff Norris or Norris' father at any time. He asked the judge at the time Norris was sentenced if the court would order restitution, as had been done in the Countee case, but the judge declined that request with the explanation that there was a dispute as to the amount which was stolen, and that the question of restitution was a civil matter. Shortly after plaintiff was sentenced King talked to Norris' attorney in the court room, and the latter agreed to confer with his client. Later that afternoon King talked to plaintiff's mother by telephone and asked for restitution, but Mrs. Norris suggested that he talk to the attorney they had engaged to represent her son. King thereupon talked to the attorney again and eventually Mr. or Mrs. Norris, through their attorney, offered to pay $25.00 as a settlement. That attorney testified that he "probably had three or four conversations with him (King) the week following the conviction," and that he then had no further contact with defendant until five or six months later, in May, 1975. King testified that after talking to plaintiff's attorney, he felt that further efforts to collect were useless, and that he thereupon abandoned the claim. His testimony, in part, is:
"A. Well, it's too small of amount to really go through any kind of trouble as far as civil proceedings. And if it wouldn't work by simple understanding between two people, two adults, or three adults, as the case was,uhI figured it wasn't worth messing with, that it was a waste of time."
The record shows that King again talked to Mrs. Norris, plaintiff's mother, and to plaintiff's attorney several months later, in May, 1975, about restitution. Mrs. Norris' testimony conflicts with that of King as to how many calls were made and as to what was said. Mrs. Norris stated that King called her three or four times in November or December, 1974, and that he did not contact her again until five or six months later, in May 1975, when he talked to her by telephone from five to eight times. She stated that in each of those two series of calls King threatened to publish plaintiff's picture and to embarrass the family if they didn't pay him the small sum he demanded. King concedes that he talked to Mrs. Norris in November, 1974, and in May, 1975, but he says that he did not talk to her nearly as many times as she contends, and he vehemently denies that he ever made any threats of any kind to her or to anyone else.
My colleagues have found that there was "repeated harassment by defendant King of plaintiff and his family," and that defendant King made "threats to plaintiff, the mother, and the integrity of the entire family." I strongly disagree with those findings, and base that disagreement not only on the evidence, as summarized above, but also on three other important circumstances.
One such circumstance is that, according to the testimony of the attorney who was *30 engaged to represent plaintiff in the criminal proceeding, Mrs. Norris talked to him several times relative to their negotiations with King. She apparently did not mention to that attorney one single time, however, that King had threatened to publish her son's picture or to embarrass the family in any way. The nearest thing to a threat which is suggested in the attorney's testimony was that Mrs. Norris left a note with his secretary on one occasion in May, 1975, indicating that King had threatened to "sue" plaintiff's father. I find nothing menacing about a threat of that kind, if it in fact was made, particularly since plaintiff's own attorney had just suggested to King that he would have to "sue" to obtain restitution and the judge in the criminal case had told him substantially the same thing. It is inconceivable to me that Mrs. Norris would not have told her own attorney about the threats of publication if any such threats, in fact, had been made. The testimony of the attorney supports and corroborates the statements of defendant King that no threats of publication and no threats of any other kind were made.
The second circumstance which convinces me that no harassment or threats occurred is the fact that the trial judge did not find that there had been any threats or harassment by King. The trial judge, instead, agreed that King had the right to erect the bulletin board display and to maintain it for a period of time. The judge eventually decided to award damages to plaintiff, but he based that decision solely on a California case, Briscoe v. Reader's Digest Association, 483 P.2d 34 (1971), and on a finding that defendant had allowed the display to remain up after Norris had become a "rehabilitated member of society."
The trial judge said:
"There seems little doubt that at the time of the offense and for a period of time thereafter the defendant was entitled to truthfully discuss this criminal act and even to publish it on the bulletin board in his business. However, this Court feels that as of the filing of this suit the plaintiff had rehabilitated himself and that the continued publication of his offense served no public interest. It is extremely difficult if not impossible to point out an exact time after which the defendant's conduct was legally impermissible. It is also difficult to allocate the embarrassment and humiliation which the plaintiff suffered between the period when the publication was permissible and the period thereafter."
The third circumstance which convinces me that there was no harassment is that, according to the record, King did not contact plaintiff or his attorney, or any member of plaintiff's family, after May, 1975, which was about the time the display was erected. The bulletin boards remained in the washateria from that date until about August, 1976. During that entire period of time, about 15 months, King did not make a single demand for payment, he did not offer to remove the boards if payment was made and he had no further contact of any kind with plaintiff, his attorney or his family, until this suit was filed. I think King would have pressed plaintiff for payment while the display was up, if it actually was his purpose to harass him. Also, when plaintiff's employer casually asked King to take down the display, it seems that King would have said something then about payment if the purpose of the display was to coerce restitution.
I think my colleagues erred in concluding, contrary to the findings of the trial court, that King made threats against plaintiff. The evidence establishes, I think, that defendant erected the bulletin board displays solely to deter further thefts in his washateria, and not to coerce anyone into paying a debt. The evidence shows that it effectively accomplished that purpose. Even if we accept my colleagues' holding that one of defendant's motives was to coerce payment, they cannot deny that his principal motive was to reduce the number of thefts which were being committed, for his own protection and that of his customers. I think that that is a reasonable and justifiable reason for the display.
*31 My colleagues have noted that "several United States Supreme Court decisions" were cited to support defendant's position. They brush off those authorities, however, without even citing them, by stating that the cases are not applicable here because they "involve publication by either the news media, or by some other organization acting in the public interest." They then hold, as I understand the opinion, that the news media has a much greater right of freedom of speech under the First Amendment than does "the ordinary individual." The majority then proceeds to apply the case of Briscoe v. Reader's Digest Association, supra, a California Supreme Court case, which also involves a publication by the news media. They don't discuss Briscoe, except to quote extensively what the trial judge had to say about it
I distinguish Briscoe, supra, because of the great difference in facts and because I do not feel that it supports the majority's holding, even if we should be inclined to follow the California rule. The facts were that plaintiff Briscoe participated in hijacking a truck in 1956. Thereafter he became entirely rehabilitated, and none of his friends knew about the incident. Eleven years later, in 1967, the defendant magazine published an article on the general subject of the hijacking of trucks, and it specifically referred to the hijacking which had been committed by Briscoe, naming him in the article and stating that he fought a gun battle with the local police. The article did not mention that that hijacking had occurred in 1956, eleven years earlier. Some other dates, ranging from 1965 to the date of publication, 1967, were mentioned in the article, however, and it left the reader with the impression that the hijacking committed by Briscoe was very recent. Briscoe's friends and his 11-yearold daughter learned of the hijacking for the first time from that article. No worthwhile purpose was served by publishing Briscoe's name and the facts relating to the incident.
The facts in Briscoe thus are vastly different from the facts presented here, but even under those facts the California Court did not award damages to the plaintiff. The trial court had sustained a demurrer and dismissed Briscoe's suit, and thereafter the Supreme Court reversed and remanded the case for trial. In doing so, the Supreme Court made it plain that it did not hold that plaintiff must prevail in the action. It found simply that Briscoe had been "completely rehabilitated," and that under the assumed set of facts, "there was no independent reason whatsoever for focusing public attention on Mr. Briscoe as an individual at this time." It remanded the case for the trier of fact to determine several things, one of which was "whether any independent justification for printing plaintiff's identity existed." Presumably, the plaintiff would not be permitted to recover if the printing of his name served a useful purpose.
In the instant suit the publicizing of Norris' name occurred shortly after the theft was committed. It was publicized only in defendant's place of business where that offense and many others had occurred. It demonstrated to would-be-thieves and to customers, the probable victims, that offenders would be caught and punished. And, it effectively reduced thefts. There was an independent justification for the display, therefore, and I believe that recovery of damages for the invasion of plaintiff's privacy should be denied even under the California rule.
Also, in Briscoe, the evidence showed that plaintiff had become rehabilitated. My colleagues do not, and I submit they cannot, make such a finding relative to Norris in this case. The record shows that when the bulletin board display was erected by King, Norris was under a suspended sentence and was on probation. It cannot be said that he had become rehabilitated by that time. Norris remained on probation for at least six or seven months after the display was first erected, and he then moved to Oklahoma to obtain a better job. There is nothing in the evidence to show whether he became any more "rehabilitated" in Oklahoma than he was here.
*32 Although my colleagues rely solely on Briscoe, supra, they have overlooked the fact that that case did not involve any questions of harassment or coercion at all. The decision was based solely on a finding that the plaintiff had rehabilitated himself after eleven years. Having cited that case as its authority, however, the majority then departed completely from the holding in Briscoe and from the holding of the trial court in the instant suit, and instead found that King's purpose in erecting the display was to harass plaintiff and to coerce restitution. I believe that if the display was for the purposes of harassment or coercion, then defendant would have had no right to erect it at all, not even for one minute. The trial court, consistent with the California Court in Briscoe, conceded that defendant had the right to erect the display and to maintain it for a period of time. The majority in the instant suit, however, bases its holding on a factual finding and on a principle of law which is entirely different from that found or applied by either the trial court in this instance or by the California Court in Briscoe. I think my colleagues have made a mistake in doing so.
The majority apparently did not consider the fact that the information publicized about plaintiff Norris was a matter of public record. I believe that they would have arrived at a different conclusion if they had considered that fact and the case of Cox Broadcasting Corporation v. Cohn, 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975), which was cited by defendant.
The Cox Broadcasting Corporation case originated in Georgia. The Supreme Court of that state, citing and relying on the California case of Briscoe, supra, held that the First Amendment rights of freedom of speech or of the press did not protect the defendant from a claim for damages for invasion of privacy, where the defendant disclosed in a news broadcast the name of a rape victim while it was reporting the rape case. (See 231 Ga. 60, 200 S.E.2d 127). An appeal was granted to the United States Supreme Court, and that tribunal reversed the Georgia Court on the ground that the victim's name was a matter of public record. The decision of the United States Supreme Court in that case clearly supercedes the ruling of the California Court in Briscoe. In Cox Broadcasting, the United States Supreme Court said:
"Thus even the prevailing law of invasion of privacy generally recognizes that the interests in privacy fade when the information involved already appears on the public record." [Emphasis added]
* * * * * *
"By placing the information in the public domain on official court records, the State must be presumed to have concluded that the public interest was thereby being served. Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business. In preserving that form of government the First and Fourteenth Amendments command nothing less than that the States may not impose sanctions on the publication of truthful information contained in official court records open to public inspection."
I agree with the majority that for many years courts in Louisiana have recognized a cause of action for "invasion of privacy." My colleagues concede, however, that the issues presented in the instant suit are res nova in this state. My own view is that in this case the majority has gone much too far in allowing the judicially-created right of privacy to prevail over the constitutionally guaranteed right of freedom of speech.
I realize that defendant should not be permitted to leave the display up indefinitely, because eventually it would cease to serve the purpose intended and the continued maintenance of it would constitute an abuse of the latter's right of freedom of speech. For that reason I would concur in that part of the trial court judgment which *33 enjoins him from continuing to publicize plaintiff's conviction. I believe, however, that the display was justified and that it was maintained for only a reasonable length of time. For that reason, I cannot agree with that part of the trial court judgment which condemns defendant, who was the victim of the crime, to pay damages to the person who committed that crime, solely because defendant informed his other customers of the fact that the theft had been committed.
For these reasons, I respectfully dissent.
NOTES
[1] Denis v. Laclerc, 1 Mart., O.S. 297 (1811).