CHARLES E. MASHBURN v. WILLIAM W. HEDRICK, M.D.

No. 8210SC670

(Filed 2 August 1983)

**Physicians, Surgeons and Allied Professions § 17.2— medical malprac-
tice—failure to diagnose—sufficient evidence of negligence**

Plaintiff's evidence was sufficient for the jury in an action to recover
damages for the amputation of plaintiff's left leg because of a circulatory
disease which defendant general practitioner allegedly negligently failed to
diagnose where it tended to show that defendant violated the standard of care
required for the examination of a patient whose symptoms include pain in the
lower extremeties upon walking and discoloration between the toes in that he
did not check the pulses in plaintiff's lower extremeties, did not compare the
temperatures of plaintiff's left and right feet, did not ask plaintiff to return for
a reevaluation of his problem or refer him to a specialist, and gave plaintiff no
instructions; plaintiff's circulatory disease was not diagnosed until after plain-
tiff saw another physician some two months after he was first examined by de-
fendant; and the lack of proper treatment by defendant was a proximate cause
of plaintiff's later amputation in that, had defendant properly diagnosed plain-
tiff's circulatory condition or referred him to a vascular surgeon, the possibili-
ty of saving plaintiff's leg from amputation would have greatly increased.

APPEAL by plaintiff from *Farmer, Judge*. Order entered 26
January 1982 in Superior Court, WAKE County. Heard in the
Court of Appeals 10 May 1983.

This medical malpractice action alleges that plaintiff
Mashburn was forced to undergo an amputation of his left leg
below the knee as a result of negligent medical treatment by the
defendant Dr. Hedrick, a general practitioner who had been
Mashburn's family doctor for many years. At trial Mashburn
presented evidence that on 25 March 1977 he went to Dr.
Hedrick's office for an examination of his left foot because, three
or four days prior, two of his toes on his left foot had turned pur-
ple and he was experiencing pain when he walked. He was first
examined by a physician's assistant who mashed his foot and
pushed back his toes. Plaintiff told the assistant that these
maneuvers were not painful but that his left leg and the bottom
of his left foot hurt when he walked. The physician's assistant
told plaintiff that he had a spur. Dr. Hedrick then examined the
plaintiff by pushing his toes back to see if it caused pain. Plaintiff
told him that this manipulation did not hurt but that it did hurt
him in his leg and foot when he walked. Dr. Hedrick also felt that

the plaintiff had a "spur" and instructed him to have his foot x-rayed. Plaintiff's left foot was x-rayed that day and it was reported as being normal. Plaintiff was not given any medication, treatment, or instructions during the 25 March 1977 examination. He was not instructed by Dr. Hedrick to return for a follow-up examination nor was he referred to another physician. Plaintiff testified that his toes remained a blue color and he continued to experience pain in his left leg and foot upon walking for four or five days after he saw Dr. Hedrick. Plaintiff's wife testified that these symptoms continued as long as six days after the 25 March 1977 examination.

The pain and discoloration reappeared in May of 1977. Plaintiff made his own appointment with an orthopedic surgeon and was examined on 18 May 1977. This doctor found no orthopedic problems but felt that plaintiff might have a circulatory disease after he felt the pulse in plaintiff's left leg, felt the leg for coolness and compared the left leg with the right leg. He referred the plaintiff back to Dr. Hedrick for the suspected circulatory problems. On 20 May 1977 plaintiff was again examined by Dr. Hedrick who had been told about the circulatory problems. Dr. Hedrick then listened to the pulse in plaintiff's leg and advised the plaintiff to see Dr. Stocks, a vascular surgeon, as soon as possible.

Plaintiff was examined by Dr. Stocks that same day. He diagnosed plaintiff's condition as peripheral vascular disease with a clot or obstruction in the thigh and popliteal area of his left leg. Plaintiff was immediately placed in the hospital where it was determined that one of the three blood vessels in plaintiff's lower left leg was obstructed. He was discharged from the hospital in four or five days and continued to see Dr. Stocks on a regular basis. Although the plaintiff was on medication to thin his blood, the pain continued in his foot and leg upon walking and he was unable to return to work. Because the plaintiff did not improve with the conservative non-surgical treatment, Dr. Stocks readmitted him to the hospital in August of 1977. An arteriogram was performed on 11 August 1977 and it showed that a second artery had clotted off, leaving only one main artery to supply blood through plaintiff's lower leg. Dr. Stocks decided that surgery was necessary and performed a vein bypass operation in an attempt to save plaintiff's leg. Several days later the bypass

vein clotted and continued to clot despite subsequent surgery. Dr. Stocks then replaced the vein graft with a synthetic material but this also clotted and gangrenous changes occurred. On 16 August 1977 Dr. Stocks amputated plaintiff's left leg below the knee. Because of the amputation plaintiff has been unable to work and has experienced severe physical pain and psychological discomfort.

At the conclusion of plaintiff's evidence the trial judge granted defendant's motion for a directed verdict. Plaintiff appeals.

*Donald Soloman and Brenton D. Adams, for plaintiff-appellant.*

*Smith, Anderson, Blount, Dorsett, Mitchell and Jernigan, by James G. Billings, for defendant-appellee.*

EAGLES, Judge.

Plaintiff first assigns error to the trial judge's entry of the directed verdict in favor of the defendant. In determining the correctness of a directed verdict, we must consider the plaintiff's evidence to be true and resolve all contradictions in his favor, giving him the benefit of every inference which can be drawn from the evidence. *Anderson v. Carter*, 272 N.C. 426, 158 S.E. 2d 607 (1968). The application of the standard of a reasonable, prudent person in a negligence action is generally considered to be better served by the decision of a jury. For this reason, the removal from the jury of this type of action by a directed verdict is to be carefully scrutinized. *Smithers v. Collins*, 52 N.C. App. 255, 278 S.E. 2d 286, *rev. denied*, 303 N.C. 546, 281 S.E. 2d 394 (1981).

The trial judge was correct in granting the defendant's motion for directed verdict if the plaintiff's evidence failed to establish any of the requisite elements of his negligence action: (1) the standard of care required of the defendant as the treating physician, (2) defendant's breach of that standard of care, (3) defendant's breach as being the proximate causation of plaintiff's injury, and (4) the damage caused by the defendant's alleged negligent treatment. *See Lowery v. Newton*, 52 N.C. App. 234, 278 S.E. 2d 566, *rev. denied*, 304 N.C. 195, 291 S.E. 2d 148 (1981).

We find that plaintiff did present sufficient evidence of the standard of care required for the examination of a patient whose symptoms included pain upon walking in the lower extremeties along with discoloration between the toes. Plaintiff presented medical testimony that in addition to visual observation and manual manipulation of the affected area, the examining physician should check for pulses going to the feet and also compare the temperature of the left and right feet for discrepancies. The patient's symptoms should be reevaluated in a few days to note any changes. The detection of abnormalities would indicate that consultation with or referral to a vascular surgeon would be appropriate to ascertain the necessity for further tests to determine the existence of circulatory problems.

As defendant concedes on appeal, the evidence, when viewed in the light most favorable to the plaintiff, was sufficient to establish that Dr. Hedrick breached the standard of care. In his examination of the plaintiff on 25 March 1977, Dr. Hedrick did not check the pulses in plaintiff's lower extremeties and did not compare the temperatures of his left and right feet. He did not ask the plaintiff to return for a reevaluation of his problem nor did he refer him to a specialist for treatment. Plaintiff was given no instructions by Dr. Hedrick.

There can be no question that evidence of the loss of the plaintiff's leg, with its attendant disruption in his lifestyle, was sufficient evidence of damages to go to the jury.

The remaining question to be determined is whether plaintiff presented sufficient evidence of causation, i.e., that the lack of proper treatment by Dr. Hedrick on 25 March 1977 was a proximate cause of the plaintiff's later amputation. Defendant contends that there is no evidence that a different result would have occurred even if he had correctly diagnosed peripheral vascular disease or referred plaintiff to a vascular surgeon on 25 March 1977. Defendant argues that since the standard of care for a patient in plaintiff's condition would entail a reevaluation of symptoms a few days after the initial visit, and since plaintiff became asymptomatic shortly after he was seen on 25 March 1977, no treatment would have ensued regardless of defendant's inaction. We do not agree.

Viewing plaintiff's evidence in the light most favorable to him reveals the following: (1) Vascular disease is a progressive disease. The plaintiff had a vascular or circulatory disease on 25 March 1977. (2) On 25 March 1977 plaintiff had certain symptoms of a vascular disease which were pain in his leg and foot upon walking and discoloration of his toes. These symptoms continued for as long as six days after the plaintiff was initially examined by Dr. Hedrick, (3) If defendant had referred the plaintiff to Dr. Stocks on 25 March 1977, Dr. Stocks would not have prescribed any drug therapy on that day but would have asked the plaintiff to return in a few days to see if plaintiff's pain and discoloration were still present. If these symptoms were visible at the time of reevaluation, more evaluative tests would have been ordered to determine if there was vascular occlusion or obstruction. (4) Plaintiff's vascular disease was not diagnosed until 20 May 1977. During the delay in diagnosis from March to May, plaintiff's disease was progressing and was not being monitored. The importance of an earlier diagnosis of a vascular condition is that earlier diagnosis would allow an earlier commencement of the selected mode of treatment and an earlier evaluation of its effectiveness. On 20 May 1977 Dr. Stocks chose to follow a conservative non-surgical treatment of plaintiff's leg until August of 1977. If Dr. Stocks had learned that plaintiff had a vascular disease in March rather than in May, he would have had more time to determine whether plaintiff was likely to develop adequate collateral flow and therefore could have recommended an operation earlier. (5) Dr. Stocks' opinion was that the success rate of an operation on plaintiff's leg was about 50% in May but only about 25% in August. The opinion of another expert, Dr. Conley, was that, based upon the arteriograms, the operation success rate was 75% to 80% on 23 May 1977 and it had declined to 8% to 10% by 11 August 1977.

We believe that the above evidence was sufficient for a jury to have found that if Dr. Hedrick had properly diagnosed the plaintiff's circulatory condition or had referred him to a vascular surgeon, plaintiff's symptoms would have still been present upon a reevaluation within five to six days later. The presence of plaintiff's symptoms upon reevaluation could have led to further tests and earlier treatment, thus increasing the possibility of saving plaintiff's leg from amputation. For purposes of the directed

verdict issue, plaintiff had adequately established the necessary elements of his negligence action. We hold that the trial judge erred in entering a directed verdict.

We are not persuaded that the failure of the saphenous vein graft effectively insulated any prior breach of care on Dr. Hedrick's part. Dr. Stocks' testimony was that one of the possible reasons for the clotting in his first vein graft, resulting in its subsequent failure, might have been a defective valve in the vein itself. This testimony in no way removes defendant's negligence as at least one proximate cause of plaintiff's injury. A defendant's negligence need not be the sole proximate cause of injury or the last act of negligence in order to impose liability. *Hester v. Miller,* 41 N.C. App. 509, 255 S.E. 2d 318, *rev. denied,* 298 N.C. 296, 259 S.E. 2d 913 (1979).

Because we find error in the entry of the directed verdict in favor of the defendant, we do not reach plaintiff's remaining assignments of error.

Reversed.

Judges WELLS and BECTON concur.