SUSIE HALL v. ROSE POST AND THE POST PUBLISHING COMPANY, INC. D/B/A THE SALISBURY POST AND MARY H. HALL v. ROSE POST AND THE POST PUBLISHING COMPANY, INC. D/B/A THE SALISBURY POST

Nos. 8627SC1011 and 8627SC1012

(Filed 19 May 1987)

1. Privacy § 1— publication of details of adoption—intrusion into private affairs—not alleged

In an action for invasion of privacy against a newspaper which printed the details of an adoption which occurred in 1967, plaintiffs did not allege an invasion of privacy based on intrusion into private affairs where plaintiffs did not allege that the information was wrongfully obtained or produce evidence otherwise suggesting that defendants committed the kind of intrusion intrinsic to the tort.

2. Privacy § 1— publication of details of adoption—publication of private facts—sufficiently alleged

Plaintiffs sufficiently alleged a claim for tortious invasion of privacy based on an unwarranted and offensive publication of private facts which were not newsworthy where defendants published the details of the 1967 adoption of plaintiff Susie Hall by plaintiff Mary Hall and the efforts of Susie's natural mother to find her in 1984. There are private matters so intimate or personal that the obvious bounds of propriety and decency require their protection from public scrutiny in the absence of any compelling justification for the revelation, and a truthful publication of such facts is constitutionally privileged under the First Amendment only if the matter is of legitimate public concern.

3. Privacy § 1— publication of details of adoption—not privileged as newsworthy

In an action for invasion of privacy arising from the publication of the details of a 1967 adoption and plaintiffs' undesired reunion with the natural mother and her husband in 1984, summary judgment for defendants was not proper on the grounds that the publications were privileged as newsworthy because reasonable minds could differ on the newsworthiness of the facts published; of particular importance in this case was the provision in N.C.G.S. § 48-25 that adoption records are closed to public inspection and that revelation of the information by any person having charge thereof is a misdemeanor.

4. Privacy § 1— publication of details of adoption—whether facts disclosed were private—summary judgment for defendants improper

In an action arising from the publication of the details of an adoption, the trial court should not have granted summary judgment for defendants on the issue of whether the facts disclosed were private where materials submitted by the parties raised an issue of fact regarding whether some or all of the facts published about the plaintiffs were publicly known or were in fact private prior to publication of the articles complained of by plaintiffs.

5. **Privacy § 1— publication of details of adoption—whether facts disclosed were offensive—summary judgment for defendants improper**

    In an action for invasion of privacy, summary judgment for defendants was not proper on the grounds that the publications were not sufficiently offensive where a jury could properly find that ordinary reasonable people would find it highly offensive and distressing to have spread before the public gaze their identities, the fact that the child had been abandoned by carnival workers, or the sensational emotional details of their encounter with the natural mother.

APPEAL by plaintiffs from *Fountain, Judge.* Judgments entered 20 May 1986 in Superior Court, LINCOLN County. Heard in the Court of Appeals 10 February 1987.

*Palmer, Miller, Campbell & Martin, P.A., by Joe T. Millsaps, for plaintiff appellants.*

*Woodson, Linn, Sayers, Lawther & Short, by Donald D. Sayers; and Adams, McCullough & Beard, by Steven J. Levitas and H. Hugh Stevens, Jr., for defendant appellees.*

BECTON, Judge.

Plaintiffs, Susie Hall and her mother, Mary Hall, filed separate civil actions for damages for alleged invasion of privacy based upon two articles published by the media defendant, The Salisbury Post, and written by the Post's Special Assignment Reporter, defendant Rose Post. In their Answers, the defendants denied the material allegations of the Complaints and asserted by way of defense the Complaints' failure to state a claim upon which relief could be granted. Defendants filed motions for summary judgment in both actions, and a consolidated hearing was held. From judgments entered 20 May 1986 granting summary judgment for the defendants, plaintiffs appeal.

The two cases have been consolidated for purposes of this appeal. We conclude that summary judgment was improperly granted, and therefore we reverse.

I

On 18 July 1984, defendant, The Salisbury Post, published a story by defendant, Rose Post, headlined "Ex-Carny Seeks Baby Abandoned 17 Years Ago," concerning the search by Lee and Aledith Gottschalk for the daughter of Mrs. Gottschalk whom she

and her first husband had abandoned in Rowan County, North Carolina in September 1967. The Gottschalks had arrived in Salisbury from Wisconsin to seek the lost child a few days before the article was published.

The Post article related the story of Mrs. Gottschalk's 1966 marriage to a carnival barker named Clarence Maxson, the birth of their daughter in June 1967, the child's subsequent abandonment at the age of four months, the progression of the mother's life after that time, and her return to Rowan County after seventeen years to look for her child. The story explained that when the carnival arrived in Rowan County in the fall of 1967, someone recommended to the parents a babysitter named Mary Hall, that Clarence made arrangements for the babysitter to keep the child for a few weeks, that the couple moved on with the carnival to Georgia and Florida, and that Clarence eventually told Aledith he had signed papers authorizing the baby's adoption.

Following Aledith's marriage to Lee Gottschalk in 1984, the Gottschalks decided to travel to Rowan County to look for the child. A search for information through old newspapers on microfilm at the public library and through the telephone directory and Salisbury High School annuals proved fruitless. Although someone at the Department of Social Services remembered that the case had been labeled an abandonment, the Gottschalks were told that adoption records are sealed. The newspaper article related the details of this unsuccessful search and focused on their grief and frustration, concluding with the following:

> If anyone, they say, knows anything about a little blond baby left here when the county fair closed and the carnies moved on in September 1967, Lee and Aledith Gottschalk can be reached in Room 173 at the Econo Motel.

Immediately following the article's publication, the Gottschalks were called at their motel by people with information regarding the child's identity and location. Meanwhile, Mary Hall had been shown a copy of the Post article and had learned that Aledith Gottschalk was looking for her daughter. Within hours of the publication, the Gottschalks went to the Halls' home but eventually communicated with Mary Hall that day only by telephone.

Hall v. Post

A follow-up story published by the Post on 20 July 1984 reported how the Gottschalks had located the child, aided by the responses to the earlier story. The article identified the child as Susie Hall and her parents as Earle and Mary Hall, and also reported the location of their home in Mooresville. In addition to relating details of the emotional telephone encounter between the Gottschalks and Mrs. Hall, the story dwelt heavily upon the emotions of both families — the Gottschalks' joy and desire to see Susie, and the distress, shock, and fear of the Halls.

According to allegations in their verified Complaints, plaintiffs fled their home in Iredell County in order to avoid the public attention drawn to them by the article, and both have sought and received psychiatric care for the emotional and mental distress caused by the incident and by their subsequent receipt of numerous cards and letters from the Gottschalks.

II

On appeal, the plaintiffs assign as error (1) the trial court's failure to grant their motion to strike portions of the affidavits submitted by defendants in support of the summary judgment motion, on the grounds that the challenged portions fail to comport with Rule 56(e), and (2) the trial court's order granting summary judgment for defendants. We need not address the first assignment of error since we conclude that, even if the challenged portions of the defendant's affidavits were properly considered by the trial court, the affidavits, pleadings, and other materials before the court established genuine issues of material fact so that summary judgment for defendants was improper.

Summary judgment is designed to "eliminate the necessity of a formal trial where only questions of law are involved and a fatal weakness in the claim . . . of a party is exposed." *Foster v. Winston-Salem Joint Venture*, 303 N.C. 636, 642, 281 S.E. 2d 36, 40 (1981). The burden is on the party moving for summary judgment to establish the lack of any triable issue of fact. *Koontz v. City of Winston-Salem*, 280 N.C. 513, 186 S.E. 2d 897, *reh. denied*, 281 N.C. 516 (1972).

The judgments entered in this case do not state the precise grounds upon which the trial court deemed summary judgment to be appropriate. However, the records and briefs submitted by the parties suggest several possible grounds, which we address.

## A

**[1]**   We first consider whether the facts alleged by plaintiffs give rise to a cognizable claim for relief for invasion of privacy.

A majority of American jurisdictions have recognized, in one form or another, a cause of action for tortious invasion of privacy. *See generally* W. Keeton, *Prosser and Keeton On The Law of Torts* Sec. 117 (5th ed. 1984). At least four distinct types of actionable invasion of privacy are identifiable from the current case law: (1) appropriation, for the defendant's advantage, of plaintiff's name or likeness, (2) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs, (3) publicity which places the plaintiff in a false light in the public eye, and (4) public disclosure of private facts about the plaintiff. *Id. See also Renwick v. News and Observer Publishing Co.*, 310 N.C. 312, 322, 312 S.E. 2d 405, 411, *cert. denied*, 469 U.S. 858, 83 L.Ed. 2d 121 (1984); Restatement (Second) of Torts Secs. 652A-I (1977). Although these four categories are not necessarily all inclusive, we make use of the classification for convenience in discussing the issues presented.

The North Carolina Supreme Court first acknowledged a common law right to privacy which is protected by civil action for damages in *Flake v. Greensboro News Company*, 212 N.C. 780, 195 S.E. 55 (1938), a case involving the "appropriation" form of the tort. *See also Barr v. Southern Bell Telephone & Telegraph Co.*, 13 N.C. App. 388, 185 S.E. 2d 714 (1972). However, in *Renwick*, the Court refused to recognize a separate cause of action for "false light" invasion of privacy due to concern that recognition of that form of the tort would "add to the tension already existing between the First Amendment and the law of torts in cases of this nature," and because the action would often overlap or duplicate the existing right of recovery for libel or slander. 310 N.C. at 323, 312 S.E. 2d at 412. North Carolina courts have not yet expressly considered the viability of the remaining "intrusion" and "publication of private facts" varieties of invasion of privacy. (In *Trought v. Richardson*, 78 N.C. App. 758, 338 S.E. 2d 617, *disc. rev. denied*, 316 N.C. 557, 344 S.E. 2d 18 (1986), this Court held that plaintiff failed to state a claim for the "private facts" version of the tort as developed in other jurisdictions without expressly deciding whether such a cause of action exists. Similarly, in *Morrow v. Kings Department Stores, Inc.*, 57 N.C.

App. 13, 290 S.E. 2d 732, *disc. rev. denied*, 306 N.C. 385, 294 S.E. 2d 210 (1982), this Court upheld dismissal of plaintiff's complaint without deciding whether an illegal search by a private individual constituted a tort.)

Plaintiffs contend that the publications by defendants constitute both an intrusion into their private affairs and solitude, and an unwarranted public disclosure of private facts. In our opinion, "intrusion" as an invasion of privacy is not involved in this case, and we express no opinion regarding the viability of such a claim. That tort does not depend upon any publicity given a plaintiff or his affairs but generally consists of an intentional physical or sensory interference with, or prying into, a person's solitude or seclusion or his private affairs. *See generally* Restatement (Second) of Torts Sec. 652B; *Prosser & Keeton* Sec. 117 at 854-56. Some examples of intrusion include physically invading a person's home or other private place, eavesdropping by wiretapping or microphones, peering through windows, persistent telephoning, unauthorized prying into a bank account, and opening personal mail of another. *Id.* Plaintiffs have not alleged that the information published was wrongfully obtained or produced evidence otherwise suggesting that defendants have committed the kind of intrusion intrinsic to this tort. Therefore, if the plaintiffs have a claim for relief, it must be for an invasion of privacy by a public disclosure of private facts.

[2] The "private facts" claim asserted by plaintiffs is that identified in Section 652D of the Restatement (Second) of Torts, and consists of the truthful disclosure to the public of private facts about the plaintiffs, which disclosure would be highly offensive and objectionable to a person of ordinary sensibilities. *See Trought v. Richardson* at 761, 338 S.E. 2d at 619. According to the Restatement commentary and our understanding of the law as it has developed in other jurisdictions, a plaintiff's right to recover for this tort is limited by the following principles. First, the disclosure of private facts must be to the *public* or a large number of people. This element is generally satisfied by any media publication. Second, the facts published must be *private*, not generally known. Third, the disclosure must be one which would be *highly offensive* and objectionable to a reasonable person of ordinary sensibilities. Finally, the matter publicized must be of a kind which is not of legitimate concern to the public, *i.e.,*

not newsworthy. *See generally* Restatement (Second) of Torts Sec. 652D.

Defendants argue that the tort of invasion of privacy should not be expanded in North Carolina to include a "private facts" cause of action because the imposition of liability for the publication of true facts raises serious constitutional questions and because of the difficulty of administering the standards outlined above. *See Anderson v. Fisher Broadcasting Co.*, 300 Or. 452, 712 P. 2d 803 (1986) and authorities cited therein at 460-63, 712 P. 2d at 808-09. Indeed, in *Renwick*, our Supreme Court based its decision to reject a "false light" cause of action in part upon the potential conflict of such a claim with the First Amendment freedoms of speech and press.

However, the United States Supreme Court, although recognizing the tension between the publication forms of invasion of privacy and these constitutionally guaranteed freedoms, has thus far declined to decide the broad question "whether truthful publications may ever be subjected to civil or criminal liability consistently with the First and Fourteenth Amendments." *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 43 L.Ed. 2d 328, 347 (1975). *See also Time, Inc. v. Hill*, 385 U.S. 374, 17 L.Ed. 2d 456 (1967). Significantly, a number of courts and commentators have resolved the issue by application of a "newsworthiness" or "public interest" standard in determining what publications are constitutionally privileged and what publications are actionable. *See, e.g., Virgil v. Time, Inc.*, 527 F. 2d 1122 (9th Cir. 1975), *cert. denied*, 425 U.S. 998, 48 L.Ed. 2d 823 (1976); *McCabe v. Village Voice, Inc.*, 550 F. Supp. 525 (E.D. Pa. 1982); *Beresley v. Teschner*, 64 Ill. App. 3d 848, 21 Ill. Dec. 532, 381 N.E. 2d 979 (1978); *Sutton v. Hearst Corp.*, 277 App. Div. 155, 98 N.Y.S. 2d 223, *appeal denied*, 277 App. Div. 873, 98 N.Y.S. 2d 589 (1950); Restatement (Second) of Torts Sec. 652D, comment h; Comment, *Privacy: The Search for a Standard*, 11 W.F.L. Rev. 659 (1975).

In determining that some publications of private facts should be actionable, we are also persuaded by the reasoning of the California Supreme Court in *Briscoe v. Reader's Digest Ass'n*:

> In a nation built upon the free dissemination of ideas, it is always difficult to declare that something may not be published. But the great general interest in an unfettered press

may at times be outweighed by other great societal interests. As a people we have come to recognize that one of these societal interests is that of protecting an individual's right to privacy. The right to know and the right to have others *not* know are, simplistically considered, irreconcilable. But the rights guaranteed by the First Amendment do not require total abrogation of the right to privacy. The goals sought by each may be achieved with a minimum of intrusion upon the other. (Footnotes omitted.)

4 Cal. 3d 529, 540-41, 93 Cal. Rptr. 866, 874, 483 P. 2d 34, 42 (1971). In our view, there are private matters so intimate or personal that "the obvious bounds of propriety and decency" require their protection from public scrutiny in the absence of any compelling justification for their revelation, *see* Warren & Brandeis, *The Right to Privacy*, 4 Harv. L. Rev. 193, 214 (1890), and a truthful publication of such facts is constitutionally privileged under the First Amendment only if the matter is of legitimate public concern. *See Virgil v. Time, Inc.*, at 1128; *Comment*, 11 W.F.L. Rev. at 678.

In so deciding, we note that the interests secured by the "false light" cause of action rejected by the *Renwick* Court remain protected, to some extent, by the availability of an action for libel or slander. In contrast, no alternate remedy is available to insure protection of the legitimate interest in keeping certain private matters private.

For the foregoing reasons, we conclude that, in an appropriate case, an unwarranted and offensive publication of private facts which are not newsworthy may give rise to a claim for relief for tortious invasion of privacy entitling the aggrieved party to at least nominal damages, and that plaintiffs have alleged sufficient facts to support this type of claim.

B

[3] Having determined that plaintiffs have stated a claim upon which relief can be granted, we next consider whether defendants have proved the nonexistence of any essential element of plaintiffs' claim. In support of their motion for summary judgment, defendants submitted the deposition of Mary Hall, answers to interrogatories by both Susie and Mary Hall, and affidavits of the

Gottschalks, the motel desk clerk at the Econo Lodge, and four acquaintances and co-workers of Mary Hall. Defendants contend that, based on these materials and the pleadings, they were entitled to summary judgment because the matter published concerning the plaintiffs was neither private nor highly offensive and was of legitimate concern to the public.

1. Newsworthiness

With regard to the newsworthiness element, the Restatement (Second) of Torts Sec. 652D, comment h, provides:

> In determining what is a matter of public interest, account must be taken of the customs and conventions of the community; and in the last analysis what is proper becomes a matter of the community mores. The line is to be drawn when the publicity ceases to be the giving of information to which the public is entitled, and becomes a morbid and sensational prying into private lives for its own sake, with which a reasonable member of the public, with decent standards, would say that he has no concern.

This is the standard adopted by the Ninth Circuit in *Virgil v. Time, Inc.* and applied in *Virgil v. Sports Illustrated*, 424 F. Supp. 1286 (S.D. Cal. 1976). *See also Sipple v. Chronicle Publishing Co.*, 154 Cal. App. 3d 1040, 201 Cal. Rptr. 665 (1984). Application of this standard requires a determination whether the publication at issue serves any legitimate purpose of disseminating news or information of public benefit, or merely constitutes the "pandering to idle curiosity which the right of privacy was designed to check." Comment, 11 W.F.L. Rev. at 681. We agree with the Ninth Circuit Court that "by the extreme limits [this standard] imposes in defining the tort, it avoids unduly limiting the breathing space needed by the press for the exercise of effective editorial judgment." *Virgil v. Time, Inc.* at 1129 (footnote omitted).

In addition to an assessment of the newsworthiness of the private facts published concerning the plaintiffs, there must be a further determination whether the *identity* of the plaintiffs as the ones to whom the facts apply is a matter in which the public has a legitimate interest. *See Virgil v. Time, Inc.* at 1131. Ordinarily, unless the persons involved are public figures or persons who

Hall v. Post

have otherwise become legitimate targets of public interest (*see* Restatement (Second) Torts Sec. 652D, comments e & f), names of persons involved in reported events are in large measure outside the scope of the public interest. *Comment,* 11 W.F.L. Rev. at 683-85. *See Briscoe; Melvin v. Reid,* 112 Cal. App. 285, 297 P. 91 (1931) (revelation in film documentary of identity of former prostitute after seven years of ordinary life held actionable). *But see Beresley v. Teschner.* Again the test is whether the revelation of identity goes beyond the giving of information to which the public is entitled to become a morbid or sensational prying for its own sake. *Virgil v. Sports Illustrated* at 1290.

Some useful criteria for assessing newsworthiness include (1) the social value of the facts published, (2) the depth of the article's intrusion into private affairs, and (3) the extent to which the plaintiff has voluntarily acceded to a position of notoriety. *See Sipple,* 154 Cal. App. 3d at 1048, 201 Cal. Rptr. at 669-70. Another important factor is the existence of any law or public policy which may reflect upon the newsworthiness of the publication. *See, e.g., Briscoe* (State's interest in encouraging rehabilitative process was key factor when court found no legitimate public interest in publication of identity of past criminal offender). *But cf. Cox v. Broadcasting Co.* (statute prohibiting publication of truthful information contained in court records open to public inspection held unconstitutional).

Of particular significance in this case is the statutory provision, in N.C. Gen. Stat. Sec. 48-25 (1984), that adoption records are closed to public inspection and that revelation of the information contained therein by any person having charge of the file is a misdemeanor under most circumstances. Unquestionably, the topic of adoption and its related issues, including issues regarding natural parents and adopted children who attempt to find one another, are of legitimate interest, in a general way, to the public. However, as a society we have determined that the benefits of anonymity in adoption proceedings generally outweigh any right of the public or of an individual to know the facts about a particular adoption. In our opinion, the requirement that adoption records be sealed reflects, in part, a legislative recognition of the potential harm to adopted children and their adoptive families, and ultimately to society, which may arise from unwarranted revelation of private facts about adoptions, and suggests that the

circumstances surrounding a particular adoption and the identities of the parties involved are ordinarily not matters of public interest. Furthermore, the fact that defendants may have obtained innocently information not in the public domain does not necessarily license them to publish the information further. *Patterson v. Tribune Co.*, 146 So. 2d 623 (Fla. App. 1962). *See also Virgil v. Time, Inc.* at 1126.

Ultimately, the determination of newsworthiness requires a balancing of the individual's right to be free from unwarranted exposure against the public's right to uncensored dissemination of information, *see Comment*, 11 W.F.L. Rev. at 668, and the dividing line must be determined by the facts of each case. *Stryker v. Republic Pictures Corp.*, 108 Cal. App. 2d 191, 238 P. 2d 670 (1951). In some cases, a court may, upon review of the publication and the pleadings, conclude as a matter of law that the subject matter of an article, including references to a particular individual, is newsworthy. *Virgil v. Sports Illustrated* at 1288. However, the publication in question is constitutionally privileged, and summary judgment for defendants is proper, only if every reasonable person would have to conclude that the published facts were newsworthy. Because newsworthiness depends upon a standard of reasonableness in light of community mores, it is an issue particularly suited for jury determination. *Id.* at 1290. *See Dingee v. Philadelphia Daily News*, 328 F. 2d 641 (3rd Cir. 1964); *Briscoe v. Reader's Digest Ass'n; Sutton v. Hearst Corp.*

Having reviewed the record in light of the foregoing, we conclude that the newsworthiness of the facts published, including the identities of the plaintiffs, the facts surrounding Susie's adoption, and the details of plaintiffs' undesired reunion with the Gottschalks, is an issue on which reasonable minds could differ and thus is a question of fact for the jury. Because a jury could reasonably find that all or some of these facts were outside the scope of legitimate public concern and were included solely for any inherent morbid, sensational, or curiosity appeal they might have, summary judgment was not proper on the grounds that the publications were privileged as newsworthy.

2. Private Facts

[4] The essence of the tort with which we are concerned is the publicizing of that which is private in character. This simply

Hall v. Post

means that no liability attaches when the defendants merely give further publicity to information which is a matter of public record or otherwise already in the public domain. *See, e.g., Cox Broadcasting; Pierson v. News Group Publications, Inc.*, 549 F. Supp. 635 (S.D. Ga. 1982); *Sipple; Hollander v. Lubow*, 277 Md. 47, 351 A. 2d 421, *cert. denied*, 426 U.S. 936, 49 L.Ed. 2d 388 (1976). However, the protected interest is not so much the right to absolute secrecy as "the right to *define* one's circle of intimacy. . . ." *Briscoe*, 4 Cal. 3d at 534, 93 Cal. Rptr. at 869, 483 P. 2d at 37 (emphasis in original). As stated in the Restatement (Second) of Torts Sec. 652D, comment b:

> Every individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself *or at most reveals only to his family or to close personal friends*. Sexual relations, for example, are normally entirely private matters, as are family quarrels, many unpleasant or disgraceful or humiliating illnesses, most intimate personal letters, most details of a man's life in his home, and some of his past history that he would rather forget. When these intimate details of his life are spread before the public gaze in a manner highly offensive to the ordinary reasonable man, there is an actionable invasion of his privacy, unless the matter is one of legitimate public interest. (Emphasis added.)

The fact that a plaintiff may have spoken freely to a small, select number of people about a private matter is not in itself a making public of the information disclosed. *See, e.g., Virgil v. Time, Inc.* at 1127. There is an "obvious and substantial difference" between this type of selective disclosure and "the disclosure of the same facts to the public at large." *Id.* "The former . . . does not constitute publicizing or public communication . . . and accordingly does not destroy the private character of the facts disclosed." *Id.* Furthermore, although ordinarily a lapse of time does not prevent renewed publicity about an event which was previously publicized, *see* Restatement (Second) Torts 652D, comment k, lapse of time may, in a rare case, when weighed along with other factors, serve to protect against renewed publication of facts that were once public knowledge when such publicity serves to unreasonably exploit the plaintiff. *Id. See, e.g., Briscoe; Melvin v. Reid.*

Defendants contend that the materials before the trial court prove conclusively that the facts surrounding Susie Hall's adoption were widely known in Rowan County prior to the publication of the articles in issue. Affidavits of two acquaintances of Mary Hall (Betty Deese and Kay Clark) state that the affiants had been told the circumstances of Susie's adoption by Mary Hall long before the publication by defendants. Two former co-workers of Mary Hall stated in their affidavits that they also knew, prior to July 1984, that Mary Hall had an adopted child that she had obtained from someone who worked at a fair or carnival, and that these facts were "discussed on a number of occasions" and were "common knowledge" among employees at the Cone Mills plant where Mary Hall worked at that time. The affidavit of the Gottschalks stated that, following publication of the first article, they received twenty to thirty calls from various people who stated that they knew Mary Hall and her adopted daughter, "many of whom knew the facts and circumstances surrounding the adoption" prior to the publication of the articles. Finally, the affidavit of the Econo Lodge desk clerk stated that, following publication of the first article, the motel received "an unusually large number of calls" and that "[s]ome of the people calling indicated that they had information concerning the child and the mother."

On the other hand, plaintiffs, in their verified Complaints, alleged that the defendants published "heretofore unknown personal facts" about their lives. In her answers to defendants' interrogatories, Mary Hall stated, in pertinent part, that she had told no one except Social Services about Susie's circumstances, that all the family members knew the facts about her adoption, that she never told anyone else about the adoption, and that none of Susie's friends knew about it. In her deposition, Mary Hall admitted only that two people (Patsy Letterman and Leda Swinger) aside from family members, knew the facts about Susie's adoption. She denied having discussed the situation with any of the affiants but admitted that Betty Deese and Kay Clark might know from other sources. She also stated that no one definitely knew Susie was adopted and that "everybody" thought her son, Herbert, and Susie were twins. None of the material before the court shed any light on whether the facts published in the second article, concerning the Gottschalks' location of and conversation with the Halls, were generally known prior to the story's publication.

We conclude that, taken in the light most favorable to plaintiffs, these materials raise an issue of fact regarding whether some or all of the facts published about the plaintiffs were publicly known or were, in fact, private prior to publication of the two articles complained of by the plaintiffs.

3. Offensiveness

[5] In order for plaintiffs to recover, the challenged publication must be of a type that would be highly offensive to a reasonable person of ordinary sensibilities. As in negligence cases, application of the reasonable person standard usually requires a jury determination. *See, e.g., Mashburn v. Hedrick*, 63 N.C. App. 454, 305 S.E. 2d 61, *disc. rev. denied*, 309 N.C. 821, 310 S.E. 2d 350 (1983). In our view, a jury could properly find that an ordinary reasonable person (adoptive mother or child) would find it highly offensive and distressing to have spread before the public gaze their identities, the fact that the child had been abandoned by carnival workers, or the sensational emotional details of their encounter with the natural mother. Consequently, summary judgment was not proper on the grounds that the publications were not sufficiently offensive.

### III

In conclusion, we hold that, as pleaded, plaintiffs have stated a valid claim for relief, that the materials offered by defendants do not justify imposition of judgment against plaintiffs as a matter of law, and that, consequently, the judgment must be reversed.

Reversed.

Judges JOHNSON and PHILLIPS concur.